[No. S121724. June 12, 2006.]

THE PEOPLE, Plaintiff and Appellant, v.
JEFFREY A. COLE et al., Defendants and Respondents;
PEARLE VISION, INC., et al., Defendants and Appellants.

## COUNSEL

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Andrea Lynn Hoch and James Humes, Chief Assistant Attorneys General, Albert Norman Shelden, Acting Assistant Attorney General, Robert M. Foster, Susan A. Ruff, Linda K. Schneider, Sherry L. Ledakis, Antoinette Cincotta, Jennifer L. Weck and Diane de Kervor, Deputy Attorneys General, for Plaintiff and Appellant.

Catherine I. Hanson and Astrid G. Meghrigian for California Medical Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Wilke, Fleury, Hoffelt, Gould & Birney, William A. Gould, Jr., Alan G. Perkins and Megan Lewis for California Optometric Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Walkup, Melodia, Kelly & Echeverria and Matthew D. Davis for Melvin Snow and Sabrina Hughes as Amici Curiae on behalf of Plaintiff and Appellant.

Robert E. Moss, Jr., and Stuart Thompson for Vision Services Plan as Amicus Curiae on behalf of Plaintiff and Appellant.

Jones, Day, Reavis & Pogue, Jones Day, Thomas R. Malcolm, Richard J. Grabowski, Daniel H. Bromberg, Amar D. Sarwal, Dominick V. Freda and Elwood Lui for Defendants and Appellants.

Timothy J. Murris and Robert Pitofsky as Amici Curiae on behalf of Defendants and Appellants.

Charles D. Conner for National Optometric Association as Amicus Curiae on behalf of Defendants and Appellants.

John T. Knox as Amicus Curiae on behalf of Defendants and Appellants.

K & R Law Group, Peter Roan and James F. Novello for California Association of Health Plans as Amicus Curiae on behalf of Defendants and Appellants.

Morrison & Foerster, Michael M. Carlson, Lori A. Schechter and Tiffany Cheung for National Association of Optometrists and Opticians as Amicus Curiae on behalf of Defendants and Appellants.

No appearance for Defendants and Respondents.

**OPINION**

**CHIN, J.**—Sections 655 and 2556 of the Business and Professions Code prohibit certain business and financial relationships between registered dispensing opticians and licensed optometrists. We granted review in this case to consider whether the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.)[1] (Knox-Keene Act) creates an exemption to these prohibitions when a licensed specialized health care service plan sublets space within the retail stores of a registered dispensing optician and employs optometrists to provide professional optometric services to plan subscribers at those locations. The Court of Appeal held that although the provisions of the Knox-Keene Act establish an exemption to the rule against the corporate practice of optometry, they do not affect the statutory prohibitions on the relationships between registered dispensing opticians and licensed optometrists. On the facts of this case, we agree with the Court of Appeal's conclusion. We therefore affirm the Court of Appeal's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

California law authorizes optometrists licensed by the California Board of Optometry and physicians licensed by the Medical Board of California (Medical Board) to perform eye examinations and write prescriptions for contacts and eyeglasses. (See Bus. & Prof. Code, §§ 2003, 2050, 3010.1, 3041, 3041.2, 3042, 3055.) After receiving a prescription, a consumer may get the prescription filled not only by optometrists and physicians who sell eyewear as part of their practice, but also by registered dispensing opticians

---

[1] All further unlabeled statutory references are to the Health and Safety Code.

(RDO's), i.e., dispensing opticians registered with the Division of Licensing of the Medical Board. (See Bus. & Prof. Code, §§ 2543, 2550, 2553, 3041, 3042.)

■ California law contains restrictions on the relationships that licensed optometrists and physicians may have with others involved in providing optical services, including RDO's. At issue here are the restrictions contained in Business and Professions Code sections 655 and 2556. The former prohibits: (1) licensed optometrists from having "any membership, proprietary interest, coownership, landlord-tenant relationship, or any profit sharing arrangement in any form, directly or indirectly," with an RDO or "with any person who is engaged in the manufacture, sale, or distribution to physicians and surgeons, optometrists, or dispensing opticians of lenses, frames, optical supplies, optometric appliances or devices or kindred products"; and (2) RDO's from having any such arrangement with a licensed optometrist. (Bus. & Prof. Code, § 655, subds. (a), (b), (c).) "Any violation of this section constitutes a misdemeanor as to" the licensed optometrist involved in the violation "and as to any and all persons . . . who participate with" the optometrist "in [the] violation." (Bus. & Prof. Code, § 655.) Business and Professions Code section 2556, as here relevant, makes it "unlawful" for RDO's "to advertise the furnishing of, or to furnish, the services of . . . an optometrist," or "to directly or indirectly employ or maintain on or near the premises used for optical dispensing, . . . an optometrist." "Any person who violates" this section "is guilty of a misdemeanor." (Bus. & Prof. Code, § 2558.) Courts have described the "basic aim" of these statutes as being "the elimination of the chance of dominion of the professional decisions of the practitioner by commercial interest."[2] (*Drucker v. State Bd. of Med. Examiners* (1956) 143 Cal.App.2d 702, 712 [300 P.2d 197].)

■ California law also restricts the relationships that optometrists may have with corporations. In general, under California's long-standing "policy . . . against [the] corporate practice of the learned professions," for-profit corporations "may not engage in the practice of . . . medicine." (*People v. Pacific Health Corp.* (1938) 12 Cal.2d 156, 158–159 [82 P.2d 429 (*Pacific Health*).) The ban on the corporate practice of medicine generally precludes for-profit corporations—other than licensed medical corporations—from providing medical care through either salaried employees or independent contractors. (*Ibid.*; *Conrad v. Medical Bd. of California* (1996) 48

---

[2] Defendants claim "there is strong evidence" that the commonly cited justification for Business and Professions Code sections 655 and 2556 "is a pretense, and that the statutes were really interest-group legislation designed to prevent competition with private optometrists who profit by selling eyewear to their patients." Defendants state that this issue was raised below in a counterclaim that was dismissed, and is separately being litigated by other parties in federal court. However, in this court, defendants do not pursue this claim and "assume[] *arguendo* that the statutes' stated justification is true." We express no view on the issue.

Cal.App.4th 1038, 1047–1048 [55 Cal.Rptr.2d 901] [discussing exceptions].) It has been held applicable with respect to optometrists. (*California Assn. of Dispensing Opticians v. Pearle Vision Center, Inc.* (1983) 143 Cal.App.3d 419, 427 [191 Cal.Rptr. 762] (*CADO*).) Courts have said that the ban on the corporate practice of medicine "is intended to ameliorate 'the evils of divided loyalty and impaired confidence' which are thought to be created when a corporation solicits medical business from the general public and turns it over to a special group of doctors, who are thus under lay control." (*Conrad v. Medical Bd. of California, supra,* 48 Cal.App.4th at pp. 1042–1043.)

Defendant Pearle Vision, Inc., operates optical stores across the country where, in a single location, consumers may obtain not only frames and contact lenses, but also eye examinations and other treatment from licensed optometrists. In the late 1970's and early 1980's, Pearle Vision Centers, Inc., which was the operating subsidiary of Pearle, Inc.'s corporate predecessor, attempted to bring this business model to California, by selling franchises to optometrists licensed in California. The California Association of Dispensing Opticians sued Pearle Vision Centers, Inc., arguing that its franchise program violated California law. The superior court issued both a temporary restraining order and preliminary injunction prohibiting Pearle Vision Centers, Inc., from offering franchises to optometrists in California. (*CADO, supra,* 143 Cal.App.3d at pp. 422–423.) In 1983, a Court of Appeal upheld the superior court's order, finding in part that by virtue of the control Pearle Vision Centers, Inc., retained under the franchise agreement, it was engaging in the illegal corporate practice of optometry.[3] (*CADO, supra,* 143 Cal.App.3d at pp. 426–428.)

In 1986, with the case against Pearle Vision Centers, Inc., still pending, the Pearle entities adopted a new strategy for bringing their operations to California; as defendants here explained in the Court of Appeal, "[i]nstead of franchising its stores to [licensed] optometrists," the Pearle entities "divided [their] operations in California in two, with" defendant Pearle Vision, Inc., "providing the services of opticians and a separate corporation," defendant Pearle VisionCare, "employing optometrists and providing their services under the Knox-Keene Act." Pearle Vision, Inc. (Pearle RDO), is an RDO; as such, it provides eyeglasses, contacts, and related fitting services using prescriptions written by licensed optometrists and ophthalmologists. (Bus. & Prof. Code, § 2550.) Pearle VisionCare (VisionCare) is a licensed "specialized health care service plan" under the Knox-Keene Act, which means that it "undertakes to arrange for the provision of health care services [in a single

---

[3] According to defendants here, "[t]he primary defendants in *CADO* were Pearle Vision Centers, Inc. and its parent company, G.D. Searle, Inc. [Citation.] G.D. Searle later reorganized and sold its Pearle entities to Grand Metropolitan Corporation, which, in turn, sold them to . . . Cole National Group, Inc. in 1996."

specialized area] to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (§ 1345, subd. (f)(1).) Operating under a license issued by the director of the Department of Managed Health Care (DMHC) (see §§ 1341, 1349), VisionCare provides, through licensed optometrists it employs or contracts with, eye examinations to individuals who pay a set enrollment fee. VisionCare's optometrists provide these examinations inside Pearle RDO's retail stores, in distinct areas set off from the rest of the store, at some locations by separate doors or internal walls. VisionCare sublets these areas from Pearle RDO. To perform examinations, VisionCare's optometrists use optometric equipment provided by Pearle RDO. Thus, as defendants explained in the Court of Appeal, "since 1986," Pearle RDO and VisionCare "have been operating in California in parallel within the same storefronts," i.e., "the 'Pearle Vision Stores.' "

Pearle RDO and VisionCare are sister corporations; they are both wholly owned subsidiaries of Pearle, Inc. Pearle, Inc.'s sole assets are shares of VisionCare and Pearle RDO. Thus, Pearle, Inc., through its subsidiaries, operates retail outlets where customers can get both eye examinations from optometrists—who are employed by VisionCare—and glasses from an optician—Pearle RDO. Pearle RDO advertises the availability of eye examinations at its retail optical stores; some of these advertisements state that eye examinations are performed by independent doctors of optometry, or that doctors in California are employed by VisionCare. According to defendants, Pearle RDO and VisionCare adopted this business "model" in order "to provide consumers with integrated optical services" by offering "optometrists' services in close proximity to affiliated eyewear stores operated by" RDO's.[4]

In February 2002, the People filed this action against Pearle, Inc., Pearle RDO, VisionCare, other related entities, and individuals who allegedly had served as officers and/or directors of these entities. In their first amended complaint, the People alleged in relevant part: (1) that Pearle RDO had violated Business and Professions Code section 17500 by disseminating advertisements that were untrue or misleading in that they implied that Pearle RDO can and does provide optometric services (including eye examinations) and the services of optometrists, when in fact Pearle RDO is prohibited by law from providing such services and maintaining an optometrist on or near its premises; (2) that Pearle RDO had violated Business and Professions Code section 2556—and, in turn, Business and Professions Code section 17200, which prohibits unfair competition in the form of an unlawful business

---

[4] Pearle, Inc., is wholly owned by defendant Cole National Group, Inc. (CNG). CNG acquired Pearle, Inc., Pearle RDO and VisionCare in 1996. CNG is wholly owned by defendant Cole National Corporation.

practice—by advertising the furnishing of optometrists and maintaining optometrists for the purpose of examining and treating eyes on or near premises used for optical dispensing; and (3) that Pearle RDO's relationship with VisionCare "and [VisionCare's] optometrists" violates Business and Professions Code section 655 and, in turn, Business and Professions Code section 17200. For relief, the People requested that the court impose civil penalties for the alleged violations and permanently enjoin Pearle RDO and VisionCare from disseminating false or misleading advertising and from violating Business and Professions Code sections 655 and 2556.

In April 2002, the People moved for a preliminary injunction prohibiting Pearle RDO from violating Business and Professions Code section 2556 by advertising the furnishing of optometric services, including eye examinations. In opposition, defendants argued that the challenged advertisements were not untrue, misleading or unlawful, because they specified that all eye examinations are performed, not by Pearle RDO, but by optometrists employed by VisionCare. In July 2002, the superior court granted the motion and issued a preliminary injunction prohibiting Pearle RDO from disseminating advertisements in California that have "the tendency or capacity to mislead the unwary or trusting consumer that [Pearle RDO] . . . employs optometrists within the State of California." Regarding the latter prohibition, the court added the following proviso: "[A]ny [Pearle RDO] advertisement . . . which references 'eye examination[s],' 'exam[s],' 'examination[s],' 'doctor[s],' 'optometrist[s],' or uses the image of a doctor is not enjoined if it prominently and, in close proximity to such word or image, states or displays: '[Pearle RDO] does not employ Doctors of Optometry and does not provide eye exams in California. [VisionCare] . . . , a licensed vision health care service plan, provides eye exams in California.' "

Defendants appealed from the order granting the preliminary injunction, arguing in part that the Knox-Keene Act "relieves" specialized health care service plans "of restrictions on employing doctors, optometrists, and other health care professionals by providing" in section 1395, subdivision (b) (section 1395(b)) "that [plans] licensed under the Knox-Keene Act 'shall not be deemed to be engaged in the practice of a profession, and may employ, or contract with, any professional . . . to deliver services.' " The People cross-appealed, arguing that the preliminary injunction did not go far enough and, under Business and Professions Code section 2556, should have prohibited *all* advertising by Pearle RDO that mentions eye examinations, regardless of the inclusion of a disclaimer stating that VisionCare, rather than Pearle RDO, provides eye examinations. Regarding section 1395(b), the People argued that this provision merely establishes an "exception regarding the corporate practice of optometry" and "does not change the laws that separate the practice of optometry from dispensing opticians/eyeglass retailers" or "permit opticians to practice or advertise the practice of optometry."

After the parties completed their briefing, the Second District Court of Appeal, in a published opinion, addressed related questions in *Consumer Cause, Inc. v. National Vision, Inc.* (Cal. App.), which we ordered depublished March 3, 2004, S119959 (*Consumer Cause*). That case involved an RDO that had set up optician centers in retail stores and, through a subsidiary licensed as a specialized health care service plan, had provided the services of licensed optometrists and ophthalmologists in separate but nearby offices within the retail stores. The Court of Appeal held that Health and Safety Code section 1395 expressly exempted both the licensed specialized health care service plan and its parent company, the RDO, from the restrictions of Business and Professions Code sections 655 and 2556.

The parties in this case, at the Court of Appeal's request, submitted additional briefs addressing the relevance of *Consumer Cause*. After receiving those briefs and hearing oral argument, the Court of Appeal held that the trial court had properly enjoined Pearle RDO's advertising, but had erred in allowing Pearle RDO to advertise eye examinations with a disclaimer. It thus ordered the superior court to expand the injunction to prohibit *all* advertising by Pearle RDO of optometric services. In so holding, the court expressly disagreed with *Consumer Cause* and concluded, based on "the plain language of" the statute, that section 1395(b) "only . . . provide[s] an exception for Knox-Keene-approved corporations from the requirement that optometrists may only be employed by professional corporations." It "does *not*," the court stated, either "expressly or impliedly . . . create an exemption from the restrictions on relationships between optometrists/ophthalmologists and opticians/optical retailers provided in Business and Professions Code sections 655 or 2556."

We granted the petition for review filed by Pearle RDO and VisionCare, limiting the issue to whether the Knox-Keene Act "exempt[s] approved providers under the Act from the limitations that Business and Professions Code sections 655 and 2556 otherwise impose on business and financial relationships between dispensing opticians and optometrists or ophthalmologists." We simultaneously ordered that the decision in *Consumer Cause* not be published.[5]

DISCUSSION

This case requires us to determine the meaning and interrelationship of several statutes. "As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105

---

[5] No petition for review was filed in *Consumer Cause*.

Cal.Rptr.2d 387, 19 P.3d 1129].) The rules for performing this task are well established. We begin by examining the statutory language, giving it a plain and commonsense meaning. (*Ibid.*) We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. (*Ibid.*) That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. (*Ibid.*) We must harmonize the various parts of the enactments by considering them in the context of the statutory frame work as a whole. (*Ibid.*) If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history. (*In re Young* (2004) 32 Cal.4th 900, 906 [12 Cal.Rptr.3d 48, 87 P.3d 797].)

### 1. *The Statutory Language Supports the People's Interpretation.*

As often happens in cases involving statutory interpretation, both sides in this case argue that the plain meaning of the statutory language supports their position. The statute the parties focus on is section 1395(b), which provides: "Plans licensed under this chapter shall not be deemed to be engaged in the practice of a profession, and may employ, or contract with, any professional licensed pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code to deliver professional services. Employment by or a contract with a plan as a provider of professional services shall not constitute a ground for disciplinary action against a health professional licensed pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code by a licensing agency regulating a particular health care profession."

Defendants assert that the "plain language" of this provision "makes it clear that Knox-Keene plans are exempted from the restrictions found in" Business and Professions Code sections 655 and 2556.[6] They reason as follows: As here relevant, Business and Professions Code sections 655 and 2556 apply only to relationships of or with licensed professional optometrists. The first clause of section 1395(b), by providing that Knox-Keene plans are not "engaged in the practice of a profession," establishes that Knox-Keene plans are not licensed professional optometrists. Because, under the first clause, "a Knox-Keene plan *itself* is not a professional," it is "not subject to . . . statutory restrictions that apply to individual professionals," including Business and Professions Code sections 655 or 2556. The second clause of section 1395(b) "reinforces" this conclusion by "grant[ing] Knox-Keene plans the authority to employ or contract with 'any professional licensed pursuant

---

[6] Like defendants, for convenience, we will use the term Knox-Keene plan to refer to a health care service plan licensed under the Knox-Keene Act.

to Division 2 [of the Business and Professions Code],' i.e., both optometrists and RDO's." This clause "unconditional[ly] authoriz[es]" Knox-Keene plans "to employ or contract with 'any' health care professional" and "specifically permit[s]" them "to establish various employment and contractual relationships with both optometrists *and* RDO's," notwithstanding Business and Professions Code sections 655 and 2556. Finally, the second sentence of section 1395(b), in providing that "[e]mployment by or a contract with a plan as a provider of professional services shall not constitute a ground for disciplinary action against a [licensed] health professional," establishes that "professionals may contract with plans" and that "neither an optometrist nor an RDO who is employed· by or contracts with a Knox-Keene plan is in violation of Business and Professions Code [section] 655 or [section] 2556."

According to defendants, "[t]he net effect of these plainly written provisions" is to "exempt[] the relationships challenged" in this case "from the limitations on business and financial relationships between RDO's and optometrists contained in [Business and Professions Code] sections 655 and 2556." Taken together, they "specifically negate[] anything in [Business and Professions Code] sections 655 and 2556 that would make it illegal for an optometrist to be employed by a plan that contracts with an RDO or optical company, or for an RDO to contract with a plan that employs optometrists." As here relevant, they establish that (1) "a Knox-Keene plan employing an optometrist may lease space from an optical company because the status of Knox-Keene plans as non-professionals, reinforced by the right of Knox-Keene plans to 'contract with' professionals to provide professional services, renders [Business and Professions Code section] 655 inapplicable to a lease of space to a Knox-Keene plan"; and (2) "optometrists and RDO's who enter into these arrangements with VisionCare cannot be disciplined under [Business and Professions Code] sections 655 or 2556 for doing so."[7]

---

[7] In a footnote, defendants argue that their interpretation is "confirmed by" the last paragraph of Business and Professions Code former section 3103, renumbered as Business and Professions Code section 3109 as of January 1, 2005, which provides: "Notwithstanding the provisions of this section or the provisions of any other law, a licensed optometrist may be employed to practice optometry . . . by a health care service plan pursuant to" the Knox-Keene Act. It appears, however, that the Legislature added this exemption in 1979 simply to bring the relevant provision of the Business and Professions Code in line with the authorization in Health and Safety Code section 1395(b). In describing this change, one legislative analysis stated: "[Business and Professions Code former] [s]ection 3103 is [being] amended to include language currently existing in the Health and Safety Code, sections 1340 through 1395 . . . . No change in law is taking place." (Sen. Com. on Business and Professions, Analysis of Sen. Bill No. 461 (1979–1980 Reg. Sess.) as amended Apr. 19, 1979.) Indeed, notwithstanding their argument, defendants acknowledge that this language was added as part of a "general 'clean-up' bill . . . to 'correct antiquated language' and bring the optometry chapter of the Business [and] Professions Code up to date."

Defendants also make the broader claim that through section 1395(b), "the Legislature specifically designed the Knox-Keene Act" to make "traditional corporate practice restrictions *inapplicable* to Knox-Keene plans." In place of these restrictions, defendants assert, the Legislature made Knox-Keene plans subject to a "comprehensive . . . regulatory scheme . . . designed in substantial part to address *precisely* [the same] concern"—"commercial interference with optometrists' professional judgment." According to defendants, Business and Professions Code sections 655 and 2556 "are precisely the type of 'corporate practice restrictions that the Legislature intended to override for health care service plans.'"

Consistent with the Court of Appeal's holding, the People argue that the "plain language" of section 1395(b) "create[s] only a narrow employment exemption and not [the] broad based commercial practice exemption" defendants assert. According to the People, the first sentence of this provision "is aimed at [Knox-Keene] plans" and "clarifie[s]" that such plans are "not subject to prosecution for the unauthorized practice of the healing arts merely because [they] employ or contract with healing-arts professionals for the delivery of services to members. Prior to Knox-Keene, this arrangement was unlawful." The provision's second sentence, the People argue, is aimed at "licensed professional providers," and simply establishes a complementary exemption for qualifying " 'professional person[s]' " from the "historical prohibition" against "working for non-professionals." Thus, although the People agree that section 1395(b) both authorizes Knox-Keene plans to "employ or contract with RDO's and optometrists," and establishes that Knox-Keene plans are not professionals, they disagree that it "relieve[s]" Knox-Keene plans or their "providers"—here, VisionCare's optometrists— "from any other obligations imposed upon them by the Business and Professions Code." Nor do the People agree that section 1395(b) "relieve[s]" Pearle RDO, "by virtue of [its] association with" VisionCare, "of the limitations" in Business and Professions Code section 655 "on financial relationships with optometrists" or "the prohibition" in Business and Professions Code section 2556 "against advertising the furnishing of optometric examinations." In short, the People argue, VisionCare's "status as a Knox-Keene plan does not shield [its] *providers* from *their* obligations under the Business and Professions Code."

In evaluating these conflicting interpretations, it is useful to begin by examining defendants' alternative characterizations of Business and Professions Code section 655 and 2556 as "relationship restrictions," "commercial-relationship restrictions," "commercial-practice restrictions," or "corporate practice restrictions." In a 1982 report to the Legislature, the California Department of Consumer Affairs (DCA) identified four different

types of "[c]ommercial practice restrictions" relating to optometry: (1) "[p]ro-hibitions against the employment of optometrists by commercial corpora-tions"; (2) "[p]rohibitions against landlord-tenant relationships between optometrists and opticians"; (3) "[r]estrictions on the number of branch offices an optometrist can operate"; and (4) "[r]estrictions on the use of trade names."[8] (DCA, Commercial Practice Restrictions in Optometry (Dec. 1982) Introduction (DCA Report).) In a 1989 rulemaking proceeding, the Federal Trade Commission (FTC) identified these same "types" of "[s]tate restrictions on commercial practice," although it characterized the first two as different "forms" of a broader "type" of restriction on "lay affiliations" with optom-etrists. (54 Fed.Reg. 10286 (Mar. 13, 1989).) Thus, it appears that California's ban on the corporate practice of optometry—i.e., employment of optometrists by for-profit corporations—and its restrictions in Business and Professions Code section 655 and 2556 on the relationships optometrists may have with RDO's and manufacturers, are properly characterized as different types of commercial practice restrictions.

With this understanding in mind, we agree with the People's reading of the statutes in question. Defendants' broad claim that the Legislature enacted Health and Safety Code section 1395(b) specifically to make restrictions like Business and Professions Code sections 655 and 2556 inapplicable to Knox-Keene plans finds little support in the statutory language. As the People observe, the "language of section 1395(b) mentions only employment and contracting relationships between [Knox-Keene] plans and providers," and contains "no mention . . . of other, broader-based commercial relationship exemptions" and no "reference to [Business and Professions Code] sections 655 and 2556." As the People also observe, the language of Business and Professions Code sections 655 and 2556 "extends well beyond employment and contracting relationships and forbids a variety of acts, such as profit sharing, proprietary interests and stock ownership." Thus, as the People argue, adopting defendants' broad claim would require us to find that the Legislature "intend[ed] to create an unstated exemption by implication to allow plans or their providers to do business outside the parameters of" other commercial practice restrictions, including Business and Professions Code section 655 and 2556. Had the Legislature intended section 1395(b) to apply to all forms of lay affiliations with optometrists, as defendants contend, it

---

[8] The report was submitted pursuant to Business and Professions Code former section 655.1, which referred to "substantial evidence that the provisions of [Business and Professions Code] [s]ection 655 may adversely affect vision care consumers in California," and required the DCA to submit "findings and recommendations for legislative action" to the Legislature after "conduct[ing] a study to determine the impact of commercial practice restrictions in the ophthalmic industry upon vision care consumers and competition in the ophthalmic industry." (Stats. 1982, ch. 1594, § 1, p. 6299.)

would not have used language limited to "employ[ing], or contract[ing] with" licensed professionals "to deliver professional services."[9] (§ 1395(b).)

In this regard, section 1395(b) stands in marked contrast to the immediately preceding subdivision, section 1395, subdivision (a), which provides that Knox-Keene plans may advertise "[n]otwithstanding Article 6 (commencing with Section 650) of Chapter 1 of Division 2 of the Business and Professions Code." Had the Legislature intended to create the broad exemption defendants posit, it no doubt would have included similar language in section 1395(b). That the Legislature did not include such language suggests it did not intend to establish a broad exemption rendering inapplicable any provision of the Business and Professions Code that could be classified as a "corporate practice" or "relationship" restriction. It is unlikely the Legislature would have established such a far-reaching exemption without being more specific about the particular restrictions being overridden, especially given the specificity of the language it used in subdivision (a) of section 1395.

Defendants' broad claim is also inconsistent with other provisions of the Knox-Keene Act. As noted above, among the types of commercial practice restrictions are restrictions on using trade names and having branch offices. In separate provisions of the Knox-Keene Act, the Legislature has specified that California's statutory restrictions on using trade names remain applicable to "specialized health care service plans" like VisionCare (§ 1366, subd. (b)), and that the restrictions in "the Business and Professions Code" on the number of branch offices remain applicable to licensed "professional[s] . . . who [are] employed by, or under contract to, a plan." (§ 1395, subd. (d).) In still another provision, the Legislature has specified that "[e]xcept as *specifically* provided in [the Knox-Keene Act], nothing in [the Knox-Keene Act] shall be construed to limit the effect of the laws governing professional corporations, as they appear in applicable provisions of the Business and Professions Code, upon specialized health care service plans." (§ 1395, subd. (f), italics added.) These provisions belie defendants' claim that the Legislature "designed the Knox-Keene Act to render [all] corporate practice prohibitions inapplicable" either to Knox-Keene plans—especially specialized Knox-Keene plans like VisionCare—or to licensed professionals performing professional services for those plans.[10]

---

[9] As amicus curiae California Medical Association (CMA) observes, the language the Legislature used in section 1395(b) closely tracks the language of decisional law on the corporate practice of medicine that existed when the Legislature passed the Knox-Keene Act. (E.g., *Pacific Health, supra*, 12 Cal.2d at p. 158 [corporations may neither "employ[]" doctors "on a salary basis" nor "engage[]" them as "independent contractors"].)

[10] That the Legislature addressed the various types of commercial practice restrictions in these *separate* provisions of the Knox-Keene Act also further undermines defendants' view that although section 1395(b), on its face, addresses only one type of restriction—the

Finally, defendants' broad claim is inconsistent with the provisions of the Business and Professions Code. The article of that code containing Business and Professions Code section 655 also contains provisions that prohibit specified licensed health care professionals from: (1) making referrals for certain services if they have "a financial interest with the person or in the entity that receives the referral" (Bus. & Prof. Code, § 650.01, subd. (a)); (2) billing for "clinical laboratory service[s] not actually rendered by" them "or under" their "direct supervision," without identifying the laboratory actually performing the service (*id.*, § 655.5, subd. (a)); (3) "employ[ing]" licensed hearing aid dispensers "for the purpose of fitting or selling hearing aids" (*id.*, § 655.2); and (4) billing for certain "cytologic services . . . not actually rendered by" them "or under" their "direct supervision." (*Id.*, § 655.6, subd. (a).) As to each of these prohibitions, the Legislature has enacted an *express*, but limited, exception that applies under certain circumstances where a Knox-Keene plan is involved.[11]

■ These express exceptions are significant for several reasons. First, as amicus curiae CMA notes, they show that "where the Legislature want[s] to exempt health plans from" commercial restrictions in the Business and Professions Code, "it clearly knows how to do so." The absence of similar provisions establishing express exceptions to Business and Professions Code sections 655 and 2556 makes defendants' broad interpretation less plausible. Second, the existence of these express exceptions is inconsistent with defendants' view that section 1395(b) renders, or was intended to render, all commercial practice restrictions in the Business and Professions Code inapplicable where Knox-Keene plans are involved.[12] Were defendants correct, these express exemptions would be superfluous. The rules of statutory

prohibition against corporations employing or contracting with licensed professionals—it nevertheless addresses a different type of restriction, i.e., the prohibition against optometrists having landlord-tenant relationships with RDO's.

[11] See Business and Professions Code section 650.02, subdivision (i) ("prohibition of [Bus. & Prof. Code, §] 650.01 shall not apply to health care services provided to an enrollee of a" Knox-Keene plan); *id.*, section 655.5, subdivision (e) ("[t]his section shall not apply to any person . . . who . . . contracts directly with a" Knox-Keene plan "if the services are to be provided to members of the plan on a prepaid basis and without additional charge or liability on account thereof"); *id.*, section 655.2 ("[t]his section shall not apply to any physician and surgeon or medical corporation which contracts with or is affiliated with a comprehensive group practice" Knox-Keene plan); *id.*, section 655.6, subdivision (d)(1) (section does not apply to "[a]ny person who . . . contracts directly with a" Knox-Keene plan "if services are to be provided to members of the plan on a prepaid basis").

[12] Business and Professions Code sections 655.2, 655.6, and 650.02 were enacted after passage of the Knox-Keene Act. As "expression[s] of legislative intent in a later enactment," they are nonbinding "factor[s] that may be considered" in construing the "earlier enacted statute." (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 492 [30 Cal.Rptr.3d 823, 115 P.3d 98].) Business and Professions Code section 655.5 was enacted in 1970, before passage of the Knox-Keene Act. It originally referred to the Knox-Mills Health Plan Act (Gov. Code, former § 12530 et seq.), which formerly regulated health plans. (*Stats.* 1970, ch. 658,

construction direct us to avoid, if possible, interpretations that render a part of a statute surplusage. (See *Fontana Unified School Dist. v. Burman* (1988) 45 Cal.3d 208, 221 [246 Cal.Rptr. 733, 753 P.2d 689]; *Stafford v. Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241].) Finally, it is significant that the Legislature, in expressly establishing Knox-Keene exceptions to commercial practice restrictions appearing in the same article of the code as Business and Professions Code section 655, made those exceptions limited. These express exceptions apply only to licensed professionals affiliated with "a comprehensive group practice" Knox-Keene plan (Bus. & Prof. Code, § 655.2), or only to health care services "provided to an enrollee of a" Knox-Keene plan (*id.*, § 650.02, subd. (i)) or to a "member[] of [a] plan on a prepaid basis" (*id.*, §§ 655.5, subd. (e), 655.6, subd. (d)(1)). That the Legislature carefully limited the Knox-Keene exemptions it expressly established casts substantial doubt on defendants' broad claim that, through section 1395(b), the Legislature *implicitly* established (or intended to establish) an *unlimited* exception that renders the commercial relationship restrictions in Business and Professions Code section 655 (or Business and Professions Code section 2556) *wholly* inapplicable when Knox-Keene plans are involved.

Indeed, the express exemptions discussed above highlight a practical problem with defendants' position: defining the scope of the exemption they assert. As the People rightly ask, under defendants' interpretation, "what happens to practitioners who provide services for both Knox-Keene plan members as well as the general public?" Does the exemption defendants assert apply to services such practitioners provide to those who are not members of the Knox-Keene plan, or is it limited to services provided to plan "enrollee[s]" (Bus. & Prof. Code, § 650.02, subd. (i)) or "members"? (*Id.*, §§ 655.5, subd. (e), 655.6, subd. (d)(1).) Does it apply to optometrists and RDO's affiliated with any Knox-Keene plan, or only to those affiliated with "a comprehensive group practice" Knox-Keene plan? (*Id.*, § 655.2.) May an optometrist and RDO employed by a Knox-Keene plan, neither of whom is regulated under the Knox-Keene Act, enter into a separate and otherwise prohibited profit-sharing agreement just between the two of them? As demonstrated by the limitations in the express statutory exemptions discussed above, these are the kinds of questions the Legislature would address in establishing a Knox-Keene exception to Business and Professions Code sections 655 or 2556. Defendants appear to argue that Business and Professions Code sections 655 and 2556 are *wholly* inapplicable to Knox-Keene plans and professionals who contract with or are employed by Knox-Keene plans. However, given the limitations on the *express* exceptions the Legislature has enacted, we have no basis to accept defendants' view that the Legislature *implicitly* established,

---

§ 1, p. 1282.) In 1978, this reference was replaced with a reference to the Knox-Keene Act. (Stats. 1978, ch. 1161, § 18, p. 3592.)

or intended to establish, an *unlimited* exception. Nor have we any basis for determining which of the possible limitations the Legislature would have chosen.

Defendants argue that insofar as these express exceptions relate to statutory restrictions that were "first enacted . . . *after* passage of the Knox-Keene Act" (see fn. 12, *ante*) they have "no bearing" on the issue here. "Under such circumstances," they contend, "it is not at all surprising that the statute would specifically address the new statute's relationship with the Knox-Keene Act." By contrast, defendants assert, because Business and Professions Code sections 655 and 2556 were enacted before the Knox-Keene Act, there is "no reason to expect" they would include language "addressing the effect of the Knox-Keene Act."

Defendants' argument is suspect in light of several legislative actions in 1979. In 1975, when the Knox-Keene Act was passed, Business and Professions Code former section 3103 (renumbered as Business and Professions Code section 3109 as of January 1, 2005), declared it to be "unprofessional conduct" for a licensed optometrist to "accept[] employment to practice optometry from . . . any company or corporation." (Stats. 1974, ch. 874, § 2, p. 1867.) In 1979, the Legislature amended this statute to include a Knox-Keene exception, by providing that "[n]otwithstanding the provisions of this section or the provisions of any other law, a licensed optometrist may be employed to practice optometry . . . by a health care service plan pursuant to" the Knox-Keene Act. (Stats. 1979, ch. 788, § 6, p. 2687.) According to one legislative analysis, the purpose of this amendment was to "conform[]" Business and Professions Code former section 3103 "to language currently existing in" the Knox-Keene Act, and "to remove inconsistencies between certain statutory . . . provisions regarding . . . employment of optometrists." (Assem. Subcom. on Health Personnel, Analysis of Sen. Bill No. 461 (1979–1980 Reg. Sess.), as amended June 20, 1979.)

The same year, the Legislature also amended *both* Business and Professions Code sections 655 and 2556, but those amendments did *not* include language referencing the Knox-Keene Act. (Stats. 1979, ch. 975, § 1, p. 3339; Stats. 1979, ch. 653, § 9, pp. 2012–2013.) The 1979 amendment to Business and Professions Code section 655 significantly strengthened that section's prohibitions by (1) deleting an exception for optometrists and RDO's who do not refer patients and customers to each other, and (2) adding subdivision (b) to make explicit that the statute not only prohibits optometrists from having proprietary relationships with RDO's, it likewise prohibits RDO's from having proprietary relationships with optometrists. (Stats. 1979, ch. 975, § 1, p. 3339.) Notably, the legislative history of the amendment contains no mention of the Knox-Keene Act, and no suggestion that Business and

Professions Code section 655 is inapplicable where optometrists and RDO's are employed by or contract with Knox-Keene plans. On the contrary, several legislative analyses explained that the revised statute would prohibit any and all proprietary relationships between optometrists and RDO's. (Legis. Analyst, analysis of Assem. Bill No. 1125 (1979–1980 Reg. Sess.) as amended June 8, 1979; Sen. Democratic Caucus, analysis of Assem. Bill No. 1125 (1979–1980 Reg. Sess.) as amended Sept. 5, 1979; Sen. Republican Caucus, analysis of Assem. Bill No. 1125 (1979–1980 Reg. Sess.) as amended Sept. 5, 1979; Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 1125 (1979–1980 Reg. Sess.) Sept. 18, 1979.) Similarly, an opposition letter submitted on behalf of Cole National Corporation argued that the revised statute "would <u>prohibit any</u> form of landlord-tenant relationship" between RDO's and optometrists "<u>under any circumstances whatsoever.</u>" (Donald Brown, Advocation, Inc., letter to Assemblymember Daniel Boatwright re Assem. Bill No. 1125 (1979–1980 Reg. Sess.) June 11, 1979, p. 1.) And, in a letter asking the Governor to veto the passed bill, Stanley Pearle, as Chairman of Searle Optical Inc., argued that the revised statute would "outlaw[] any landlord-tenant relationship between an optician and optometrist" and "exclude[]" opticians "from making available to their customers one-stop shopping for both optometric services and optical goods." (Stanley Pearle, letter to Governor Jerry Brown re Assem. Bill No. 1125 (1979–1980 Reg. Sess.) Sept. 19, 1979, pp. 1–2.) These events undermine defendants' assertion that there is "no reason to expect language in [Business and Professions Code] sections 655 addressing the effect of the Knox-Keene Act."

■ Defendants also err in asserting that the People's interpretation, by making part of section 1395(b) surplusage, violates our rules for construing statutes. According to defendants, because the second clause of section 1395(b)'s first sentence expressly authorizes plans to "employ, or contract with, any" licensed professional, reading the entire sentence as "only" an authorization to hire licensed professionals gives no effect to the sentence's first clause, which provides that "[p]lans licensed under this chapter shall not be deemed to be engaged in the practice of a profession . . . ." (§ 1395(b).) However, as noted above, the People's interpretation gives meaning to the first sentence's first clause by acknowledging that it establishes that in providing health care services through licensed professionals, Knox-Keene plans are not "engaged in the practice of a profession." (§ 1395(b).) Under California law, "[t]he practice of optometry is the performing or the controlling of any of the acts set forth in [Business and Professions Code] [s]ection 3041." (Bus. & Prof. Code, § 3070.) Thus, without the first clause of section 1395(b), a Knox-Keene plan's provision of optometric services through hired optometrists, though expressly authorized, would likely constitute the practice of optometry. Under the People's interpretation, the provision's first clause

definitively establishes otherwise.[13] Thus, the People's interpretation gives meaning to that clause, just not the expansive meaning defendants proffer: a broad exemption from all the otherwise applicable commercial-relationship restrictions in the Business and Professions Code.

■ Like their broad claim regarding section 1395(b), defendants' discussion of the statute's specific application in this case suffers from several problems. Defendants are correct, and the People agree, that in light of the first clause of the statute—Knox-Keene plans "shall not be deemed to be engaged in the practice of a profession" (*ibid.*)—VisionCare itself is not a "person licensed" as an optometrist within the meaning of Business and Professions Code section 655. However, as here relevant, Business and Professions Code section 655, subdivisions (a) and (b), prohibit licensed optometrists from having a "landlord-tenant relationship" with RDO's either "directly or indirectly." Although section 1395(b) would appear to preclude a finding that Pearle RDO and VisionCare's optometrists "directly" have a prohibited "landlord-tenant relationship" within the meaning of Business and Professions Code section 655, it does not preclude a finding that they "indirectly" have such a prohibited relationship.[14]

■ Nothing in section 1395(b) supports defendants' contrary position. As defendants acknowledge, that section authorizes Knox-Keene plans "to 'contract with' professionals *to provide professional services.*" (Italics added; see § 1395(b) [plans may contract with licensed professionals "to deliver professional services"].) Similarly, section 1395(b) provides that a licensed professional may not be disciplined for contracting "as a provider of professional services" with a plan. Pearle RDO's rental agreement with VisionCare does not constitute a contract "to deliver professional services," and Pearle RDO,

---

[13] That the Legislature could have decided otherwise is demonstrated by its enactment, only four years before passing the Knox-Keene Act, of a statute providing: "The offering and operation by a medical corporation of a health care service plan . . . shall be the practice of medicine by such corporation, and is hereby authorized." (Stats. 1971, ch. 1467, § 1, p. 2897.)

[14] This case comes to us upon the trial court's issuance of a preliminary injunction regarding advertising, and the trial court has yet to decide whether the relationship between Pearle RDO and VisionCare's optometrists violates Business and Professions Code section 655. Nor has the trial court decided whether Pearle RDO has violated Business and Professions Code section 2556's prohibitions against "furnish[ing] the services of . . . an optometrist" and "directly or indirectly employ[ing] or maintain[ing]" an optometrist "on or near the premises for optical dispensing." We express no view on these questions, which are beyond the scope of the issue on which we granted review. Because we do not answer these questions, we also cannot, and do not, address defendants' argument that because Business and Professions Code sections 655 and 2556 do not prohibit the arrangements at issue here, the latter's prohibition against RDO's advertising "the furnishing of" an optometrist's services "must be read" to allow Pearle RDO to advertise those arrangements, and that Pearle RDO therefore has not violated that prohibition.

as VisionCare's landlord, is not acting "as a provider of professional services."[15] (§ 1395(b).) Although section 1395(b) expressly authorizes Knox-Keene plans to employ licensed optometrists to provide professional services, it does *not* provide that optometrists so employed may operate without regard to other professional restrictions. Moreover, the Knox-Keene Act elsewhere provides that Knox-Keene plans "shall employ and utilize allied health manpower for the furnishing of services *to the extent permitted by law*." (§ 1367, subd. (f), italics added.) In short, with respect to Knox-Keene plans, section 1395(b) removes only one preexisting restriction on licensed health care professionals: the ban on employment by a corporation other than a medical corporation. Nothing in its language establishes or suggests that it removes other restrictions on the relationships such professionals may have, such as the prohibition against "directly or indirectly" having a landlord-tenant relationship with an RDO. (Bus. & Prof. Code, § 655.) A licensed professional working for a Knox-Keene plan who is disciplined for having such a prohibited relationship is not being disciplined for that employment, but for additionally having a prohibited relationship.

Defendants' discussion of Business and Professions Code section 2556 fares no better. Again, defendants are correct that, in light of Health and Safety Code section 1395(b), VisionCare itself is not an "optometrist" within the meaning of Business and Professions Code section 2556. However, contrary to defendants' claim, this fact does not establish that Pearle RDO does not "directly or indirectly employ or maintain on or near the premises for optical dispensing . . . an optometrist" within the meaning of Business and Professions Code section 2556.

---

[15] Our discussion assumes that RDO's, which are "registered" with the Division of Licensing of the Medical Board (Bus. & Prof. Code, § 2550), otherwise qualify under Health and Safety Code section 1395(b) as "professional[s] *licensed* pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code." (Italics added.) As already noted, the People concede that section 1395(b) authorizes Knox-Keene plans to "employ or contract with RDO's." We also note that the statutory chapter on RDO's appears in the division of the Business and Professions Code mentioned in Health and Safety Code section 1395(b); that Business and Professions Code section 655 refers to persons "licensed" under the provisions relating to RDO's; and that Business and Professions Code section 23.7 states that "[u]nless otherwise expressly provided, 'license' means license, certificate, registration, or other means to engage in a business or profession regulated by this code . . . ."

Our discussion also assumes that, as the People assert, VisionCare does not provide VisionCare's subscribers with "eyewear benefits under the plan," and that Pearle RDO's only contractual arrangement with VisionCare is the lease agreement. Defendants do not contest this assertion. Nor did they oppose the People's request for judicial notice of a sample membership contract VisionCare filed with the DMHC, which indicates that VisionCare's plan does not cover the costs of frames, lenses or contacts. Given the facts, we have no occasion to discuss the application of these statutes where a Knox-Keene plan employs or contracts with both optometrists and RDO's to provide professional services.

Defendants' contrary analysis of the statutory language is unpersuasive. Defendants argue that "the second clause of [section] 1395(b) plainly authorizes relationships like VisionCare's," and that whatever the phrase "indirectly employ or maintain on or near the premises" means (Bus. & Prof. Code, § 2556), it "cannot apply to optometric services provided by a Knox-Keene plan, pursuant to express statutory language allowing the plan to provide such services and exempting it from restrictions applicable to professionals." Defendants are incorrect; as explained above, section 1395(b) authorizes Knox-Keene plans to contract with licensed professionals "to deliver professional services," not, as defendants contend, "to lease space in" RDO's retail optical stores. As a landlord, Pearle RDO simply is not acting "as a provider of professional services." (§ 1395(b).)

■ Finally, we reject defendants' assertion that because Business and Professions Code sections 655 and 2556 "carry[] misdemeanor penalties," we should apply the rule that directs courts to resolve ambiguities in penal statutes in the defendant's favor. That rule " 'applies only if the court can do no more than guess what the legislative body intended.' " (*People v. Avery* (2002) 27 Cal.4th 49, 58 [115 Cal.Rptr.2d 403, 38 P.3d 1].) It does not apply " 'unless two reasonable interpretations of the same provision stand in relative equipoise' " (*ibid.*), i.e., that "the defendant's proposed interpretation is at least as plausible as that of the People. [Citations.]" (*People v. Hammer* (2003) 30 Cal.4th 756, 771, fn. 13 [134 Cal.Rptr.2d 590, 69 P.3d 436].) Because, for the reasons stated above, defendants' interpretation is not equally plausible, the rule is inapplicable.[16]

### 2. *Extrinsic Sources Do Not Support Defendants' Interpretation.*

Although asserting that the plain language of section 1395(b) is dispositive, defendants also rely heavily on various extrinsic sources. As explained below, defendants' discussion of these sources is unpersuasive.

---

[16] In supporting defendants' interpretation, amicus curiae California Association of Health Plans (CAHP) relies in part on a provision defendants do not mention: section 1395, subdivision (c), which provides that a licensed "health care service plan . . . may directly own, and may directly operate through its professional employees or contracted licensed professionals, offices and subsidiary corporations . . . as are necessary to provide health care services to the plan's subscribers and enrollees." By its terms, that provision does not apply here because VisionCare, the specialized Knox-Keene plan, does not "directly own" and "directly operate" Pearle RDO's retail stores. (§ 1395, subd. (c).) Given this fact, we express no opinion on the People's view that the provision is inapplicable for another reason: because it mentions only "health care service plan[s]" (§ 1395, subd. (c)), and therefore does not apply to *specialized* health care service plans like VisionCare.

### a. *Prior Administrative Construction*

Defendants assert that "[t]he agencies charged with administering the Knox-Keene Act have applied [defendants'] understanding of the Act for almost two decades." In support of their argument, defendants rely principally on a petition the Attorney General filed, as counsel for the California Board of Optometry, with the FTC in 1989, and on internal memoranda of the Medical Board's Division of Licensing and the Department of Corporations (DOC), which was originally charged with administering the Knox-Keene Act.

██ Defendants' reliance on these documents is unavailing. How much, if any, "deference" we give the type of administrative interpretation defendants cite depends on "a complex of factors material to the substantive legal issue before [us], the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) Several of the relevant factors indicate that deference is unwarranted here. First, the FTC petition and the internal agency memoranda were not "contemporaneous with" enactment of the relevant statutes (*id.* at p. 13); they were all prepared years later. Second, none of these documents discusses the relevant statutory language or reflects "careful consideration" of the precise issue before us. (*Ibid.*) Third, the internal memoranda, which are essentially advice letters prepared by individual staff members, are not entitled to the deference we afford " 'a regulation adopted after public notice and comment.' " (*Ibid.*)   ██ Finally, the issue here is the construction of statutes, and we generally "are less inclined to defer to an agency's interpretation of a statute than to its interpretation of a self–promulgated regulation. [Citation.]" (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1265 [8 Cal.Rptr.3d 532, 82 P.3d 740].) Here, we have no reason to believe the agencies in question have a " 'comparative interpretive advantage over the courts' " in interpreting the relevant statutes. (*Yamaha, supra,* 19 Cal.4th at p. 12.) For these reasons, the documents defendants cite do not persuade us to adopt defendants' interpretation.[17]

██ Nor are we persuaded by defendants' more general assertion that since 1986, "California regulators" have either expressly approved, or failed to object to, the operation of specialized Knox-Keene vision care plans affiliated with optical companies that are RDO's. As the People point out, "no

---

[17] We also note that, contrary to defendants' claim, none of the cited documents states that either the Knox-Keene Act in general or section 1395(b) in particular makes commercial practice restrictions inapplicable to specialized Knox-Keene plans. However, in light of the factors discussed above, we need not detail the reasons why our reading of these documents differs from defendants'.

state agency has ever promulgated a regulation or issued a formal opinion interpreting the [Knox-Keene] Act to create an exemption to Business and Professions Code sections 655 or 2556." And, as we stated over 70 years ago in rejecting a similar argument by a dentist who sought to overturn his suspension for aiding the unlawful corporate practice of dentistry, "[d]elayed action on the part of those who are charged with the execution of laws will not be permitted to annul the law. It may be considered by the court as a reason for the mitigation of punishment, but the judicial department is not absolutely bound to regard it."[18] (*Painless Parker v. Board of Dental Exam.* (1932) 216 Cal. 285, 299 [14 P.2d 67] (*Painless Parker*).) Ultimately, the interpretation of a statute is a question of law for the courts to decide.[19] (*Reno v. Baird* (1998) 18 Cal.4th 640, 660 [76 Cal.Rptr.2d 499, 957 P.2d 1333].)

### b. *Legislative History*

Defendants rely in part on the legislative history of the Knox-Keene Act, which was enacted through passage of Assembly Bill No. 138 (1975–1976 Reg. Sess.). They cite statements in an Assembly third reading analysis that the Knox-Keene Act "opens licensure to for-profit organizations which were prohibited under earlier registration procedure," and that "regulating performance regardless of the corporate status is seen as a more logical way to control abuses." (Assem. Off. of Research, 3d reading analysis, Assem. Bill No. 138 (1975–1976 Reg. Sess.) as amended Apr. 17, 1975.)

■■■ Contrary to defendants' assertion, these statements provide little, if any, support for defendants' broad interpretation. To the extent they explain that the Knox-Keene Act permits for-profit corporations to deliver health care services, these statements are fully consistent with the People's view that section 1395(b) simply exempts Knox-Keene plans from the rule that otherwise prohibits for-profit corporations from employing licensed health care professionals to provide health care services. The same is true regarding the comment about the benefits of regulation, viewed in context. The Assembly third reading analysis explained that, although existing law "prohibited" licensing of "for-profit organizations," such entities were "find[ing] their way

---

[18] *Regarding punishment—imposition of fines and penalties—defendants state that they have asserted "estoppe[l]" in the trial court, and that the issue "is not implicated here."*

[19] We also note that, according to documents submitted by amici curiae Melvin Snow and Sabrina Hughes, as early as February 2002, the same month the Attorney General filed this action, the Medical Board rejected several RDO applications based on its view that Business and Professions Code sections 655 and 2556 preclude an RDO from subleasing space within its retail store to a specialized Knox-Keene plan so that optometrists employed by the Knox-Keene plan may provide optometric services to plan members at those locations. Thus, there is reason to question defendants' assertion that "[t]he present lawsuit is the first manifestation . . . of any official objection to the legality of th[e] arrangements" at issue here.

into the system via subsidiary for-profit management and supply companies to a nonprofit corporate shell." (Assem. Off. of Research, 3d reading analysis, Assem. Bill No. 138 (1975–1976 Reg. Sess.) as amended Apr. 17, 1975.) "Consequently"—i.e., because for-profit entities were finding ways to avoid existing prohibitions—"regulating performance regardless of the corporate status [was] seen as a more logical way to control abuses" than prohibiting for-profit entities from providing health care services. (*Ibid.*) Again, this discussion is fully consistent with the People's view that section 1395(b) simply exempts Knox-Keene plans from the rule against for-profit corporations employing licensed health care professionals. It does not indicate a more expansive intent to eliminate all other restrictions on the relationships that licensed health care professionals may have.[20]

Indeed, a complete review of the Knox-Keene Act's voluminous legislative history does not support defendants' broad interpretation of section 1395(b) and generally supports the People's more limited reading of that section. The legislative analyses consistently stressed two key aspects of the Knox-Keene Act: "a new licensing and [expanded] regulatory structure governing health care service plans" and a "transfer" of regulatory authority "from the Attorney General to the Department of Corporations." (Assem. Com. on Health, Analysis of Assem. Bill No. 138 (1975–1976 Reg. Sess.) as amended Apr. 17, 1975, p. 1.) Some, but not all, of the analyses also briefly noted, with little or no discussion, that the Knox-Keene Act would change existing law by allowing for-profit corporations to operate as licensed health care services plans. (*Id.,* Assem. Com. on Health, Analysis of Assem. Bill No. 138 (1975–1976 Reg. Sess.) as amended Apr. 17, 1975, pp. 7–8; Assem. Off. of Research, 3d reading analysis of Assem. Bill No. 138 (1975–1976 Reg. Sess.) as amended Sept. 2, 1975, pp. 1–2; Assem. Com. on Ways & Means, Analysis of Assem. Bill No. 138 (1975–1976 Reg. Sess.) as amended Apr. 17, 1975, p. 2; Sen. Com. on Health & Welfare, Analysis of Assem. Bill No. 138 (1975–1976 Reg. Sess.) as amended June 27, 1975, p. 2.) However, nowhere in the limited discussion of this change is there any mention of an intent to sweep away all other restrictions on commercial relationships in the Business

[20] Defendants also cite the statement at an April 1974 press conference of former Assemblymember John Knox, who cosponsored the Knox-Keene Act. The statement, which did not identify the proposed legislation by bill number, apparently related not to Assembly Bill No. 138, which was introduced in December 1974, but to Assembly Bill No. 3385 (1973–1974 Reg. Sess.), which dealt with the same subject and which former Assemblymember Knox introduced the day before the press conference. There were many similarities between Assembly Bill No. 3885, as introduced, and Assembly Bill No. 138, but there were also many differences, including one of particular note here. Section 1395(b), as proposed in Assembly Bill No. 3885, apparently would have applied only to licensed plans providing a broad range of "basic health care services," and not to " 'specialized' " plans providing services in "a single specialized area of health care such as optometry . . . ." (Assem. Bill No..3885 (1973–1974 Reg. Sess.) as introduced Apr. 18, 1974, pp. 6–7, 24.) In any event, nothing in the cited statement is inconsistent with the People's interpretation.

and Professions Code. Nor is there any discussion of the pros and cons of maintaining or creating an exemption from any other relationship restriction. Instead, consistent with the People's interpretation, the relevant discussion indicates no more than an intent to establish an exception to only one such restriction: the prohibition against for-profit corporations employing licensed health care professionals to provide health care services. Had the Legislature intended to enact the broad and sweeping exemption defendants assert, the legislative history would, no doubt, contain some mention of that intent.

### c. *Statutory Purpose*

Defendants argue that their interpretation is strongly supported by the purposes of the Knox-Keene Act, specifically, to "preserv[e] the quality of care," to "ensur[e] easy access to care," and to "reduc[e] health care costs through competition." Defendants assert that adopting the People's view "would cause serious harm to consumers, without any offsetting benefit." In making their argument, defendants rely principally on a 1986 finding by the FTC, based largely on earlier studies, that because "commercial practice" restrictions "increase prices" and thus "reduc[e] the frequency with which consumers obtain vision care," they "decrease the overall quality of care" without "provid[ing] offsetting quality-related benefits." (54 Fed.Reg. 10286 (Mar. 13, 1989).) Defendants also rely on a 1982 finding by the DCA, based on FTC data, that California's "commercial practice restrictions [would] cost California consumers $102 million in 1983." (DCA Rep., *supra*, Executive Summary, p. i.) Defendants argue that, in light of these findings, their interpretation would promote the Knox-Keene Act's purposes, whereas the People's interpretation would defeat those purposes by "inflict[ing] sharply higher costs, reduced services, and lower-quality care on California consumers."

The premise of defendants' argument—that commercial practice restrictions increase prices and reduce the overall quality of care by decreasing the frequency of visits—appears to be open to question. The People, citing several analyses and scholarly criticisms, challenge not only the findings of the FTC and the DCA, but also the methodology and objectivity of the earlier studies on which those findings were based. The People also argue that even were these underlying studies correct when done, "the almost 30-year old . . . data" from those studies and the FTC's finding based on that data "have little relevance to California's current vision care market."

This policy debate was before our Legislature in 1979 when it strengthened Business and Professions Code section 655 (see pp. 982–983, *ante*), and again in 1983 and 1985 when it rejected proposals to repeal some or all of the prohibitions in that section and in Business and Professions Code section

2556. The relevant legislative history demonstrates that defendants' corporate predecessors participated in those proceedings, opposing the 1979 legislation and supporting the unsuccessful repeal proposals based on the same arguments and studies defendants offer here.[21] Thus, defendants are now inviting us to resolve in their favor an old *policy* debate based on arguments and studies that have, thus far, failed to move the Legislature. We decline the invitation. In light of the legislative history and the contrary studies the People cite—one of which was published in 1995—we have no basis for concluding that the Legislature agrees with defendants' view or that the findings on which defendants rely were accurate when made more than 20 years ago, are accurate now, or are now or ever were applicable to California's vision care market.[22] Instead, we leave this policy debate with the body to which it rightly belongs: the Legislature, which has "the ability to gather empirical evidence, solicit the advice of experts, and hold hearings at which all interested parties may present evidence and express their views." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 694, fn. 31 [254 Cal.Rptr. 211, 765 P.2d 373].)

Defendants also assert that their interpretation is consistent with another purpose of the Knox-Keene Act: to "prevent[] commercial influence" on professional judgment through "comprehensive regulatory oversight rather than by structural prohibitions on with whom [a Knox-Keene] plan may affiliate." In making this argument, defendants first assert that the "corporate practice restrictions barring for-profit corporations from the health care field [are] expressly based on concern" that professional judgment may be influenced by " 'the profit motive of the corporation employer,' " and that the Legislature "expressly abolished this bar for Knox-Keene companies, based

---

[21] (E.g., Donald Brown, Advocation, Inc., letter to Assemblymember Daniel Boatwright re Assem. Bill No. 1125 (1979–1980 Reg. Sess.) June 11, 1979, p. 1 [arguing for Cole National Corporation that the strengthened statute would be "anti-competitive and anti-consumer" and would "caus[e] inconvenience and potentially higher prices to" consumers]; Stanley Pearle, letter to Governor Jerry Brown re Assem. Bill No. 1125 (1979–1980 Reg. Sess.) Sept. 19, 1979, pp. 1–2 [arguing for Searle Optical Inc., that the strengthened statute would "prevent[] aggressive competition in [California's] optical business," would result in "higher prices for California consumers," and would "not [be] in the best interest of the consuming public"]; Assem. Health Com., Analysis of Assem. Bill No. 1926 (1983–1984 Reg. Sess.) as amended May 4, 1983, pp. 2–3 [proposed repeal of Bus. & Prof. Code, §§ 655 and 2556 "was introduced at the request of Pearle Vision Centers" and was based on DCA and FTC data]; Assem. Health Com., Analysis of Assem. Bill No. 1217 (1985–1986 Reg. Sess.) as amended Mar. 28, 1985, p. 2 [proposed repeal was "sponsor[ed]" by "Pearle Health Services," which "argue[d] that restrictions in existing law on vision care services are anti-competitive and reduce patient access to care"].)

[22] Nor can we conclude that the FTC findings are, or ever were, valid as to ophthalmologists, given the FTC's statement that the regulation it had promulgated "was never intended to address commercial practices by ophthalmologists," and that "there is little evidence concerning" such practices. (54 Fed.Reg. 10300, fn. 164 (Mar. 13, 1989).) Yet defendants' interpretation of section 1395(b) would apply equally to such professionals.

on the judgment that in the Knox-Keene context it [is] 'more logical . . . to control abuses' by 'regulating performance' pursuant to a comprehensive regulatory scheme." Defendants then assert that because the "concerns cited as the basis for [Business and Professions Code sections] 655 and 2556 are almost identical to those which underlie corporate practice prohibitions," we should construe Health and Safety Code section 1395(b) also to abolish the prohibitions in Business and Professions Code sections 655 and 2556 where Knox-Keene plans are involved. According to defendants, "[i]n view of [the Knox-Keene Act's] express focus on protecting professional independence, no purpose (other than protecting the business interests of optometrists and reducing the availability of vision care to California consumers) would be served by applying [Business and Professions Code sections] 655 and 2556 in the Knox-Keene context."

We believe that we should leave to the Legislature the decision whether the justification for exempting Knox-Keene plans from the prohibition against employing optometrists also warrants an exemption from the prohibitions of Business and Professions Code sections 655 and 2556. To paraphrase one of our prior decisions, "[t]he question before us is, of course, one of statutory construction and we do not decide whether the Legislature in [1975] should have [established this exemption] or whether it should do so now. That is a public policy issue properly left to the Legislature. . . . 'Our holding [must be] based on the [Knox-Keene] Act as it is written, not on a different, perhaps broader, version that could have been, or still may be, enacted.' [Citation.] Public policy, however, is a relevant, albeit secondary, consideration for our decision in the present case. We are asked in this case to decide whether the Legislature intended to abolish a well-established legal doctrine that raises significant public policy considerations. We are not persuaded the Legislature would have silently, or at best obscurely, decided so important and controversial a public policy matter and created a significant departure from the existing law." (*In re Christian* (1994) 7 Cal.4th 768, 782 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

For similar reasons, we reject defendants' policy arguments for deferring to what they claim has been the "accepted [administrative] practice" for "nearly two decades." According to defendants, "[i]t is extremely important for [Knox-Keene] plans to be able to develop their products and plans knowing that there is but a single set of state law standards they must satisfy, and with the understanding that actions approved by their designated state regulator—the DMHC—are permissible and may be undertaken with confidence." Defendants assert that by now adopting the People's interpretation, we would frustrate this need for certainty—and thus "defeat the purposes of the Knox-Keene Act"—by "rais[ing] the specter of later intervention by the Attorney General to declare unlawful (and seek penalties for) activity and structures long approved by the DOC and DMHC." Defendants also more

broadly assert that adopting the People's interpretation will "deter investment in California, by undermining confidence in the stability of the legal structures under which businesses operate, and contributing to a perception that California's legal climate is unfriendly to business and makes this State a risky place to invest or operate." These arguments, which are unrelated to the language of the governing statutes, should be directed to the Legislature. As stated earlier, we must take the law as it is written, and "[d]elayed action on the part of those who are charged with [its] execution . . . will not be permitted to annul [it]." (*Painless Parker, supra,* 216 Cal. at p. 299.) Thus, we leave it to the Legislature to determine whether defendants' policy arguments merit modification of the law.[23]

### DISPOSITION

For the reasons discussed above, we affirm the judgment of the Court of Appeal and remand the case for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Moreno, J., Corrigan, J., and Ikola, J.,[*] concurred.

---

[23] Amici curiae John Knox and CAHP make the related argument that in passing the Knox-Keene Act, the Legislature divested the Attorney General of authority to challenge a statutory interpretation that the director of the DMHC renders in acting on an application for a Knox-Keene license, and of jurisdiction to bring this action. Because these issue are beyond the scope of the issue on which we granted review, we decline to address them.

[*] Associate Justice, Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.