IN THE SUPREME COURT OF THE STATE OF KANSAS

Nos. 113,675
113,834

CENTRAL KANSAS MEDICAL CENTER, d/b/a
St. Rose Ambulatory and Surgery Center,
*Appellant*,

v.

STANLEY M. HATESOHL, M.D.; GREAT BEND
REGIONAL HOSPITAL, L.L.C.; and
CENTRAL KANSAS FAMILY PRACTICE, P.C.,
*Appellees*.

SYLLABUS BY THE COURT

1.

The corporate practice of medicine doctrine forbids a corporation from hiring a physician to practice medicine that the corporation itself is not licensed to provide. Contracts in violation of this doctrine are illegal and unenforceable.

2.

The Legislature created an exception to the corporate practice of medicine doctrine that permits a corporation with an ambulatory surgical center license to hire physicians to provide medical services within the scope of that license.

3.

A licensed ambulatory surgical center, as defined by K.S.A. 65-425(f), is authorized to operate "primarily for the purpose of performing surgical procedures."

4.

On the facts of this case, the physician's family medicine practice fell outside the scope of the corporation's ambulatory surgical center license. As a result, his employment contract with the corporation was void for violating the corporate practice of medicine doctrine.

Review of the judgment of the Court of Appeals in an unpublished opinion filed March 18, 2016. Appeal from Barton District Court; RON SVATY, judge. Opinion filed September 7, 2018. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

*Samuel L. Blatnick*, of Kutak Rock LLP, of Kansas City, Missouri, argued the cause, and *G. Mark Sappington*, *Meredith A. Webster*, and *M. Courtney Koger*, of the same firm, were with him on the briefs for appellant.

*Stephen H. Netherton*, of Hite, Fanning & Honeyman, L.L.P, of Wichita, argued the cause, and *Arthur S. Chalmers* and *Randy J. Troutt,* of the same firm, were with him on the briefs for appellee Stanley Hatesohl, M.D.

*Keynen J. Wall,* of Forbes Law Group, LLC, of Overland Park, argued the cause, and *Michael J. Fleming*, *Frankie J. Forbes*, and *Quentin Templeton*, of the same firm, were with him on the briefs for appellees Great Bend Regional Hospital, LLC, and Central Kansas Family Practice, P.C.

PER CURIAM:  This case arises from a contract dispute between Dr. Stanley Hatesohl, a family medicine doctor, and his former employer, Central Kansas Medical Center (CKMC), d/b/a St. Rose Ambulatory and Surgery Center (St. Rose). CKMC is a nonprofit general corporation that is licensed to operate an ambulatory surgical center (ASC). CKMC contracted with Dr. Hatesohl to provide family medicine services at St. Rose for two years. This contract contained several postemployment covenants. After two years, Dr. Hatesohl resigned and began practicing family medicine at Great Bend Regional Hospital's (GBRH) Central Kansas Family Practice clinic (CKFP).

2

CKMC sued Dr. Hatesohl for violating the postemployment covenants and GBRH and CKFP for tortiously interfering with the contract. The Barton County District Court granted summary judgment for the defendants on the grounds that the contract between CKMC and Dr. Hatesohl violated the Kansas corporate practice of medicine doctrine. This doctrine forbids a corporation from hiring a physician to practice medicine that the corporation itself is not licensed to provide. The Court of Appeals reversed and remanded.

We conclude the district court was correct and hold the contract between CKMC and Dr. Hatesohl violated the corporate practice of medicine doctrine. Consequently, we reverse the decision of the Court of Appeals and affirm the district court's grant of summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Dr. Hatesohl is a licensed physician who is board certified in family medicine. In September 2012, he moved to Great Bend to practice family medicine at CKMC, d/b/a St. Rose. He entered into a two-year employment contract with CKMC to provide family medicine services at St. Rose until September 30, 2014. The contract stated that Dr. Hatesohl "shall provide a minimum of forty (40) hours of professional Family Medicine services at [St. Rose's] Family Medicine clinic, known as St. Joseph Family Medicine Clinic . . . or such other site or sites as may be mutually agreed upon." The contract also required Dr. Hatesohl to "perform other medical and related duties, including, to the extent applicable to a physician practicing Family Medicine, as determined by [St. Rose]."

The contract contained postemployment covenants that generally prohibited Dr. Hatesohl from doing the following for one year after his employment with St. Rose

3

ended: practicing family medicine within a 50-mile radius of St. Rose; employing St. Rose's staff; and soliciting St. Rose's patients and staff. The contract also forbid Dr. Hatesohl from disclosing or misusing St. Rose's confidential and proprietary information.

At first, Dr. Hatesohl worked in St. Rose's family medicine clinic. But soon, CKMC integrated its family medicine and urgent care practices into one clinic, called St. Rose Family Medicine and Urgent Care. In March 2014, Dr. Hatesohl submitted a letter of resignation, citing frustration with the integration. However, he later rescinded his resignation and worked at St. Rose for the remainder of the contractual period.

In August 2014, Dr. Hatesohl notified St. Rose that he would not renew his contract. When rumors circulated that Dr. Hatesohl was considering employment nearby, Centura Health Corp. (Centura), St. Rose's managing organization, sent him a letter stating its intent to enforce the postemployment covenants. Counsel for Dr. Hatesohl replied that the covenants were not binding because the contract "violates the Kansas prohibitions against the corporate practice of medicine [doctrine]."

On October 1, 2014—the day after his contract with St. Rose expired—Dr. Hatesohl entered into an employment contract with GBRH to practice family medicine at CKFP, which was located across the street from St. Rose. Around that time, Dr. Hatesohl forwarded emails from his St. Rose account to his personal one, which contained information that St. Rose claims was confidential. At CKFP, Dr. Hatesohl continued to treat around 50-60 patients from St. Rose.

In November 2014, CKMC petitioned for injunctive relief and damages against Dr. Hatesohl, GBRH, and CKFP, alleging: (1) Dr. Hatesohl breached his contract by competing within a 50-mile radius of St. Rose, soliciting its patients and staff, and misappropriating its confidential information; (2) GBRH and CKFP (referred to collectively as GBRH from now on) tortiously interfered with Dr. Hatesohl's contract

4

with St. Rose; and (3) Dr. Hatesohl was unjustly enriched. CKMC also moved for a restraining order and a temporary injunction to prevent Dr. Hatesohl from violating the postemployment covenants.

Dr. Hatesohl and GBRH countered that the contract was unenforceable because it violated Kansas' common law prohibition against the corporate practice of medicine, as set forth in two key cases: *Early Detection Center, Inc. v. Wilson*, 248 Kan. 869, 811 P.2d 860 (1991), and *St. Francis Regional Med. Center, Inc. v. Weiss*, 254 Kan. 728, 869 P.2d 606 (1994). In *Early Detection Center*, this court held that "[a] general corporation is prohibited from providing medical services or acting through licensed practitioners" and any such contract is unenforceable. 248 Kan. at 880. In *St. Francis*, this court recognized a statutory exception that permits a corporation with a hospital license to contract for the services of licensed physicians. 254 Kan. at 746. Relying on these cases, they argued St. Rose violated the prohibition against the corporate practice of medicine by acting outside the scope of its ASC license to employ Dr. Hatesohl to practice family medicine.

That same month, the Barton County District Court held a hearing on the motion for a restraining order. The court denied that motion and scheduled an evidentiary hearing on the temporary injunction motion for December. Meanwhile, CKMC filed a reply in support of its motion for a temporary injunction, arguing the *St. Francis* exception extends to *any* licensed medical care facility, including St. Rose. Thus, CKMC claimed St. Rose could employ Dr. Hatesohl without violating the corporate practice of medicine doctrine.

In December 2014, the court held a three-day evidentiary hearing on the temporary injunction motion. Leanne Irsik, senior vice-president and site administrator of Centura at St. Rose, testified about CKMC's corporate structure and medical licenses. She explained that CKMC is a Kansas nonprofit general corporation that operates as St. Rose.

At that time, St. Rose offered a variety of medical services that were housed in separate departments: primary care, laboratory, imaging, cardiopulmonary/sleep lab, home health and hospice, general surgery, and ASC. St. Rose held an ASC medical care facility license, as well as pharmacy, home health, and radiation materials licenses.

Irsik testified that Dr. Hatesohl worked in the primary care clinic called St. Rose Family Medicine and Urgent Care. He had privileges to provide consulting services in the ASC department but did not have privileges to perform surgeries there. Irsik affirmed that family medicine "is a branch of medicine that addresses the care of a patient from the beginning to the end of life and focuses on general health and wellness of patients" whereas an ASC provides primarily surgical and diagnostic services to patients who can stay no longer than 24 hours. She emphasized that the primary care clinic and the ASC operated as separate sections of St. Rose and had separate identifying numbers for billing purposes. But all payments ultimately flowed to CKMC.

Irsik also traced the history of CKMC's medical care facility licenses. Until 2011, CKMC was licensed as a hospital. But in January 2011, CKMC sent a letter to the Kansas Department of Health and Environment (KDHE) declaring its intention to transition to "an outpatient model, including comprehensive urgent care services, same-day surgery and cancer care." The letter explained, "As part of this transition, CKMC will terminate its hospital license and seek licensure for part of its existing facility as an ambulatory surgery center. The entire new facility will now be referred to as St. Rose Ambulatory & Surgery Center."

In April 2011, the KDHE granted St. Rose a medical care facility license that recognized St. Rose as "a Kansas ambulatory surgical center as defined at KAR 28-34-50 et seq." See K.A.R. 28-34-50(b)(2) (defining an ASC as "an establishment with . . . permanent facilities that are equipped and operated primarily for the purpose of performing surgical procedures and do not provide services or other accommodations for

6

patients to stay more than 24 hours"). The next month, the KDHE sent a letter confirming that CKMC "is no longer doing business as a Kansas licensed general hospital." Since then, St. Rose has renewed its ASC license each year.

The parties entered St. Rose's ASC license applications into evidence. Each application asked St. Rose to designate the type of medical care facility license requested: general hospital, ASC, critical access hospital, or special hospital. St. Rose checked the ASC box each time. Each application also contained a check-box list of "optional organized services, departments, or units" and asked St. Rose to indicate any it provided. The list included surgery, obstetrical, pediatric, and physical therapy departments, among others. St. Rose checked only the "surgery department" box each time.

Dr. Hatesohl testified on his own behalf. He explained that family medicine is a specialty that cares for the whole family, from birth to death. A family medicine practitioner may perform minor surgical procedures, such as laceration repair and fracture care, but not major ones. As Dr. Hatesohl summarized:

> "We're typically . . . the specialty that patients see first for medical problems. If they come in with a cough, shortness of breath, chest pain, typically, we're what are considered the gatekeepers of the medical system. . . . [W]e can do some initial testing and determine if they need to go see a cardiologist or a pulmonologist, or need to be hospitalized, or whether they can, you know, safely have surgery, that sort of issues."

Dr. Hatesohl provided preoperation evaluations for his patients who were going to have surgery, no matter where the surgery would take place. He needed no privileges to perform these evaluations. But he did have privileges with St. Rose to provide consultations to clear patients for surgery. He explained:

> "In my role at St. Rose . . . these privileges were specifically for patients that didn't have a primary doctor to do pre-op clearance, or they came in that morning of surgery and

7

there was either some sort of issue going on, possibly an abnormal EKG, possibly some respiratory difficulties, some sort of issue that the surgeon was questioning whether the patient was appropriate to undergo general anesthesia."

However, Dr. Hatesohl did not recall providing this consulting at St. Rose. He applied for—but did not receive—privileges to perform minor procedures at St. Rose, such as shoulder dislocation and laceration repairs. As a result, Dr. Hatesohl never had surgical privileges at St. Rose.

The parties also presented extensive evidence about Dr. Hatesohl's alleged contract breaches and the healthcare needs of Great Bend. But that evidence is not germane to this appeal, given the procedural posture of the case and the sole question petitioned for review—whether the district court erred when it granted summary judgment because the contract violated the corporate practice of medicine doctrine.

In February 2015, the defendants moved for summary judgment on all counts, claiming the undisputed facts showed that CKMC's ASC license did not cover family medicine, and therefore, its contract with Dr. Hatesohl violated the corporate practice of medicine doctrine. In response, CKMC moved for summary judgment on its breach of contract and tortious interference claims, arguing St. Rose was a licensed medical care facility that could contract with Dr. Hatesohl under *St. Francis*. CKMC also argued that no Kansas statute or regulation prohibited St. Rose from employing Dr. Hatesohl to practice family medicine.

At this point, CKMC moved to join St. Catherine's Hospital (St. Catherine) as a necessary plaintiff because CKMC had recently transferred its right to enforce Dr. Hatesohl's contract to St. Catherine as part of a corporate change. CKMC also moved for leave to file an amended petition, which would assert the following new claims:  (1) tortious interference against Dr. Hatesohl's wife, Ann Hatesohl; (2) intentional spoliation

8

of evidence against Dr. Hatesohl and Ann; and (3) unjust enrichment against GBRH. Dr. Hatesohl did not contest the addition of St. Catherine but reserved the right to challenge any additional claims against himself and his wife. GBRH opposed only the motion to add the unjust enrichment claim.

Later that month, the district court denied the temporary injunction and granted summary judgment for the defendants by email, stating the contract was illegal pursuant to *Early Detection Center* and *St. Francis.* In April 2015, the court formalized the ruling in a journal entry containing findings of fact and conclusions of law. On appeal, the parties dispute only the conclusions of law, which state in relevant part:

> "2.     Defendant Hatesohl entered in the Employment Agreement, which is the subject of this action, on July 30, 2012 with CKMC. The main provision of the contract was his agreement to provide a minimum of 40 hours a week of professional family medicine services . . . . At the time of signing the contract, CKMC was not operating under a hospital license, but under a license as an ambulatory surgical center ('ASC'), as defined in K.S.A. 65-425(f). CKMC never had a license as a hospital during the contract time with Defendant Hatesohl. CKMC's ASC license did not authorize it to provide family practice medical services in a clinic.

> "3.     The Employment Agreement is illegal and thus unenforceable because it violates Kansas public policy that forbids a corporation from employing licensed medical doctors to provide medical services to third-parties that the corporation is not licensed to perform. See *Early Detection Center, Inc. v. Wilson*, 248 Kan. 869 (1991) (['A general corporation is prohibited from providing medical services or acting through licensed practitioners; therefore, there can be no contract between the general corporation and third parties to perform medical services').

> "4.     *Wilson* also stated, 'it is well settled both in law and equity that the courts will not aid either party to an illegal agreement. The law leaves the parties where it found them.' *Id*. at 879. Therefore, the [post-employment] covenants . . . are unenforceable and invalid.

9

"5.    In *St. Francis Medical Center, Inc. v. Weiss*, 254 Kan. 728 (1994), the Court acknowledged its precedent, which rejected corporate ownership of medical practices, *Id.* at 734, but found them distinguishable because the plaintiff was a licensed hospital. *Weiss* does not support the [argument that the] Employment Agreement is enforceable because CFMC's [*sic*] medical license, as an ASC, did not extend to provision of family practice medical services in a clinic.

"6.    CFMC's [*sic*] claims of tortious interference with contract and unjust enrichment both require the Employment Agreement to have been legal and enforceable. Therefore, the above rulings make moot any contentions of interference with contract and unjust enrichment."

For the same reasons, the court denied CKMC's motion for summary judgment and motion to amend the petition. The court also declined to add St. Catherine as a necessary party because it was in privity with CKMC and bound by the judgment. Finally, the court assessed costs against CKMC. CKMC promptly appealed the ruling.

When the parties later disputed costs, the court awarded $3,309.70 to Dr. Hatesohl and $1,882.10 to GBRH, with postjudgment interest at the highest amount authorized by statute. CKMC appealed the costs order, and the two cases were consolidated on appeal.

In the Court of Appeals, CKMC argued the district court erred by: (1) granting summary judgment for the defendants; (2) denying its motion to join St. Catherine as a plaintiff; (3) denying its motion to add new claims against the Hatesohls; and (4) awarding costs and postjudgment interest to the defendants. The panel reversed on all four grounds and remanded for further proceedings. *Central Kansas Medical Center v. Hatesohl*, No. 113,675, 2016 WL 1079481 (Kan. App. 2016) (unpublished opinion).

The panel reversed summary judgment for three primary reasons. First, the panel believed the district court erroneously held that St. Rose "was the equivalent of its

ambulatory surgical center clinic." 2016 WL 1079481, at *18. Instead, the panel believed the ASC was just one of many departments within St. Rose. Second, the panel held the plain language of the Kansas statutes and regulations governing ASCs does not forbid an ASC from providing family medicine services or restrict it to providing only surgery. 2016 WL 1079481, at *9-10. Third, the panel held the contract did not violate the Kansas prohibition against the corporate practice of medicine. In so doing, the panel extended the *St. Francis* exception—for corporations with a hospital license—to corporations with an ASC license, like CKMC. 2016 WL 1079481, at *15.

Dr. Hatesohl and GBRH petitioned for review of the panel's reversal of summary judgment. CKMC filed no cross-petition. Thus, the only question before us is whether the district court erred when it held the contract between CKMC and Dr. Hatesohl violated the Kansas corporate practice of medicine doctrine and granted summary judgment for the defendants. See Supreme Court Rule 8.03(h)(1) (2018 Kan. S. Ct. R. 56) (generally "the issues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review or cross-petition allege were decided erroneously by the Court of Appeals"). Indeed, the remaining issues depend on whether summary judgment was proper in the first place.

ANALYSIS

The core question in this appeal is whether an exception to the corporate practice of medicine doctrine permitted CKMC to lawfully contract with Dr. Hatesohl to practice family medicine. To answer this, we must first determine whether the rationale of *St. Francis*—which held that a corporation with a hospital license may contract for the services of a physician—applies with equal force to a corporation with an ASC license. If so, we must next consider whether Dr. Hatesohl's family medicine practice fell within the scope of CKMC's ASC license. This requires us to examine the plain language of the medical licensing scheme in tandem with the undisputed facts about Dr. Hatesohl's

11

family medicine practice. The bottom line is, the corporate practice of medicine doctrine forbids a corporation from contracting with a physician to practice medicine that the corporation itself is not licensed to perform. Any contract in contravention of this doctrine is unenforceable.

We hold the logic of *St. Francis* permits a corporation with an ASC license to hire physicians to practice medicine *within the scope of that license*. An ASC is authorized to operate "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f). When an ASC offers a medical service that falls outside this scope, it violates the corporate practice of medicine doctrine. Here, Dr. Hatesohl's family medicine practice fell outside the scope of CKMC's ASC license because it bore no relation to the surgical procedures at St. Rose. Accordingly, we hold the contract between Dr. Hatesohl and CKMC is unenforceable, reverse the Court of Appeals, and affirm the district court's grant of summary judgment for the defendants.

The standard for reviewing summary judgment is well established:

> "'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.'" *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

12

See K.S.A. 2017 Supp. 60-256(c)(2). Thus, we review the district court's grant of summary judgment de novo. *Netahla v. Netahla*, 301 Kan. 693, 696, 346 P.3d 1079 (2015).

Likewise, the interpretation of statutes and administrative regulations presents questions of law subject to de novo review. In this endeavor, we must give effect to the intent expressed by the plain language of the text. *Pener v. King*, 305 Kan. 1199, 1208, 391 P.3d 27 (2017). This means we give common words their ordinary meanings, without adding to or subtracting from the text as it appears. We only resort to textual construction when the language is ambiguous. *State v. Gray*, 306 Kan. 1287, 1294, 403 P.3d 1220 (2017); *State v. Prine*, 297 Kan. 460, 474-75, 303 P.3d 662 (2013). And we give no deference to an agency's interpretation of its regulations. *May v. Cline*, 304 Kan. 671, 675, 372 P.3d 1242 (2016).

*The Corporate Practice of Medicine Doctrine*

We begin our analysis by clarifying the contours of the corporate practice of medicine doctrine. Beginning with *Winslow v. Board of Dental Examiners*, 115 Kan. 450, 452, 223 P. 308 (1924), this court held a corporation cannot practice dentistry through the employment of a licensed dentist. The court soon extended this rule to optometry, holding that "the practice of the [optometry] profession is limited to individuals, and that corporations cannot be chartered to engage therein." *State, ex rel., v. Goldman Jewelry Co.*, 142 Kan. 881, 890, 51 P.2d 995 (1935); see *State, ex rel., v. Zale Jewelry Co.*, 179 Kan. 628, 633, 298 P.2d 283 (1956) (prohibiting a jewelry company from practicing optometry through the employment of a licensed optometrist).

These early decisions rested on "judicial interpretation that the licensure requirements apply to persons and not to corporations." *Early Detection Center*, 248 Kan. at 874. For example, *Winslow* held the licensing scheme contemplated a "personal"

practice of dentistry because: "Corporations may not be graduated from dental colleges, they have neither learning nor skill, and they may not be examined, registered, nor licensed as dentists. Therefore the legislature does not permit the organization of a domestic corporation to practice dentistry." 115 Kan. at 452. Likewise, *Goldman* reasoned that a corporation was disqualified from practicing optometry because the governing statutes required an optometrist to be a person who was at least 21 years old and possessed certain education credentials. Thus, the corporate practice of medicine doctrine derived from the legislative intent inherent in the medical licensing statutes, which limited the practice of medicine to licensed persons.

Next, in *Early Detection Center*, the court considered whether a general corporation could lawfully provide noninvasive vascular testing medical services through licensed physicians. Part of the analysis centered on what effect, if any, subsequent statutory enactments had on prior caselaw. After the early cases but before *Early Detection Center*, the Legislature enacted the Kansas Healing Arts Act (HAA), K.S.A. 65-2801 et seq., and the Professional Corporation Law of Kansas (PC Law), K.S.A. 17-2706 et seq. L. 1957, ch. 343, § 1 (HAA); L. 1965, ch. 157, § 1 (PC Law). Generally, the HAA prohibits a person from practicing any branch of the healing arts without a license, and the PC Law permits licensed physicians to form professional corporations to provide medical services. See K.S.A. 2017 Supp. 65-2803(a) (HAA); K.S.A. 17-2709(a) and K.S.A. 2017 Supp. 17-2707(b)(9) (PC Law).

The *Early Detection Center* court construed these acts as supplementing, rather than replacing, prior caselaw. As the court explained,

> "The Healing Arts Act was passed in 1957, subsequent to our decision in *State, ex rel., Fatzer v. Zales Jewelry Co.*, 179 Kan. 628. The legislature, in drafting the language of the Healing Arts Act, did not define or broaden the word 'person' such that its meaning differed from our decisions in *Winslow*, *Goldman*, and *Zales*.

14

"Where a statute has been construed by the highest court having jurisdiction to pass on it, such constructions are as much a part of the statute as was written into it originally. All statutes are presumed to be enacted with full knowledge of the existing condition of the law and with reference to it. *State, ex rel., v. Moore,* 154 Kan. 193, 199, 117 P.2d 598 (1941). The legislature in drafting the language of the Healing Arts Act did not change the prior judicial interpretation that the licensure requirements apply to persons and not to corporations." 248 Kan. at 873-74.

The court also noted that the Legislature carved out a statutory exception for professional corporations to practice medicine through licensed physicians but did not do so for general corporations. 248 Kan. at 875-77.

Ultimately, the *Early Detection Center* court affirmed prior caselaw and held that "[a] general corporation is prohibited from providing medical services or acting through licensed practitioners; therefore, there could be no contract between the general corporation and the third parties to perform the services." 248 Kan. at 880. We later summarized *Early Detection Center*'s rationale this way:

"This court's basic rationale in refusing to enforce the agreement between Early Detection Center and Dr. Wilson was as follows: In Kansas, the practice of medicine requires a license. An examination must be taken in order to obtain a license. Because only individuals can take examinations, only individuals can be licensed to practice medicine. The *Zale, Goldman,* and *Winslow* cases, decided in 1956, 1935, and 1924, respectively, equated a corporation's employing a licensed professional individual who practiced dentistry or optometry with a corporation's practicing that profession. When the legislature subsequently enacted the Healing Arts Act, the Professional Corporation Law, and the General Corporation Code [K.S.A. 2017 Supp. 17-6001 et seq.], it had the opportunity to include provisions which would have changed the judicial interpretation, but it did not do so. Thus, the rule that a general corporation is prohibited from providing medical services or acting through licensed practitioners still applies." *St. Francis*, 254 Kan. at 734-35.

15

Most recently, in *St. Francis*, this court recognized an exception to the corporate practice of medicine doctrine for corporations licensed as hospitals. In *St. Francis*, a nonprofit corporation with a hospital license sought to enforce the liquidated damages provision of its employment contract with a doctor who resigned. The doctor moved for summary judgment, claiming the contract was unenforceable according to *Early Detection Center*, but the district court denied the motion. On appeal, this court held that a corporation *with a hospital license* could contract for the services of a physician. 254 Kan. at 746.

The *St. Francis* decision hinged on the fact that the corporation was "a hospital licensed by the State of Kansas as a medical care facility and a health care provider." 254 Kan. at 746. In contrast, the corporation in *Early Detection Center* was an unlicensed diagnostic clinic. And this distinction made all the difference. In *Early Detection Center*, the court found no statutory exception to save the corporation from the default rule that an unlicensed corporation cannot practice medicine through licensed practitioners. 248 Kan. at 876-77. But the *St. Francis* court observed that the medical care facility licensing statutes, K.S.A. 65-425 et seq., not only permit a corporation to be licensed as a hospital but also require a licensed hospital to employ physicians to accomplish its statutorily defined purpose. 254 Kan. at 744-46.

The *St. Francis* court explained that K.S.A. 65-425(h) defines "medical care facility" as "a hospital, ambulatory surgical center or recuperation center." 254 Kan. at 744; see K.S.A. 65-425(j) (the term "hospital" is divided into three types: "general hospital," "critical access hospital," and "special hospital"). These medical care facilities must be licensed by the KDHE. K.S.A. 65-427; K.S.A. 65-425(e). As defined by statute, a "general hospital" must provide "physician services" and "diagnosis and treatment for patients who have a variety of medical conditions." K.S.A. 65-425(a). In the same vein, a "special hospital" must provide "physician services" and "diagnosis and treatment for

16

patients who have specified medical conditions." K.S.A. 65-425(b). The court also noted that the Kansas Health Care Provider Insurance Availability Act (HCPIAA) defines "health care provider" to include a "medical care facility licensed by the state of Kansas." K.S.A. 2017 Supp. 40-3401(f); 254 Kan. at 737.

Given this, the court held that a corporation licensed as a hospital is required by statute to provide physician services to treat patients. 254 Kan. at 744-45. Moreover, the court reasoned that "[i]t would be incongruous to conclude that the legislature intended a hospital to accomplish what it is licensed to do without utilizing physicians as independent contractors or employees." 254 Kan. at 745. Thus, the court recognized "what is and has been a reality for decades—hospitals employ physicians." 254 Kan. at 745. After all, "[w]ithout physicians, nurses, and medical technicians, a hospital cannot achieve that for which it is created and licensed—to treat the sick and injured." 254 Kan. at 745.

Finally, the court determined that permitting licensed hospitals to employ physicians would not harm the public welfare or run afoul of prior caselaw. 254 Kan. at 746. The court distinguished *St. Francis* from past precedent, explaining:

> "As previously noted, in *Early Detection Center, Inc. v. Wilson,* 248 Kan. 869, 811 P.2d 860 (1991), we relied upon the cases of *Winslow, Goldman,* and *Zale.* The basic rationale for those decisions was that to permit a corporation to practice a licensed profession would be injurious to the public welfare. Such a prohibition was necessary to protect the public health. . . .

> . . . .

> "None of these early cases dealt with a hospital's employing a physician nor prohibited such employment. None of these cases dealt with a corporation in the business of providing health care to the general public. We agree that *Early Detection Center* should not be extended beyond its facts and is distinguishable from the present case.

17

Here, the corporation employing the physician is a hospital licensed by the State of Kansas as a medical care facility and a health care provider. This difference is crucial to our determination and it distinguishes a hospital from a 'diagnostic clinic,' which was involved in *Early Detection Center.*" 254 Kan. at 745-46.

Therefore, the court held that "neither Kansas case law nor statutory law prohibits a licensed hospital from contracting for the services of a physician. Such contracts are not contrary to the interest of public health, safety, and welfare and, therefore, are legally enforceable." 254 Kan. at 746.

To recap, from *Winslow* to *St. Francis*, this court has affirmed the general rule that a corporation cannot circumvent the medical licensing scheme by hiring a physician to practice medicine that the corporation is not licensed to provide. In *Early Detection Center*, the court recognized that the Legislature—with full knowledge of the corporate practice of medicine doctrine—carved out an exception for physicians to form professional corporations but did not abolish the default rule. See *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 906, 249 P.3d 434 (2011) ("'[C]ourts presume the legislature acts with knowledge of existing statutory and case law when it enacts legislation.'"); *City of Haven v. Gregg*, 244 Kan. 117, 122, 766 P.2d 143 (1988) ("In Kansas, the common law remains in force, unless modified by constitutional amendment, statutory law, or judicial decision."). Later in *St. Francis*, the court held another statutory exception exists for corporations licensed as hospitals.

Because no party asks us to overturn this precedent, we apply it on the basis of stare decisis and will not question its validity sua sponte. See *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 362-63, 361 P.3d 504 (2015) ("points of law established by a court are generally followed by the same court and courts of lower rank in later cases in which the same legal issue is raised"); *Rhoten v. Dickson*, 290 Kan. 92, 117, 223 P.3d 786 (2010) ("Appellate courts do not ordinarily consider issues the parties failed to raise unless an

18

issue's consideration is necessary to serve the ends of justice or to prevent the denial of fundamental rights."). Accordingly, we now turn to the question presented: whether an exception to the corporate practice of medicine doctrine allowed CKMC to contract with Dr. Hatesohl to practice family medicine.

*An exception to the corporate practice of medicine doctrine permits an ASC to hire physicians to practice medicine within the scope of the ASC license.*

At the outset, we note that no party directs us to any statute that authorizes a general corporation to provide medical services without a medical care facility license. And upon our review, we also found none. Given this, CKMC's power to provide family medicine services must arise from its ASC license.

Generally, *St. Francis* charts the course for a corporation with an ASC license to lawfully hire physicians within the bounds of its statutorily defined purpose. Like the licensed hospital in *St. Francis*, a licensed ASC is a "medical care facility" and "health care provider" under the relevant statutes. See K.S.A. 65-425(h) (defining "medical care facility" to include an ASC); K.S.A. 2017 Supp. 40-3401(f) (defining "health care provider" under the HCPIAA to include "a medical care facility licensed by the state of Kansas"). As the Court of Appeals said,

> "It makes little practical sense to allow a licensed hospital to contract for the services of a physician but to prohibit a licensed ambulatory surgical center from contracting for the services of a physician since both of these entities are included within the definition of a 'medical care facility' at K.S.A. 65-425(h)." *Hatesohl*, 2016 WL 1079481, at *15.

19

But more importantly, the statutory definition of an ASC plainly calls for the employment of physicians to treat patients. K.S.A. 65-425(f) defines an ASC as:

> "an establishment with an organized medical staff of one or more physicians; with permanent facilities that are equipped and operated *primarily for the purpose of performing surgical procedures*; with continuous physician services during surgical procedures and until the patient has recovered from the obvious effects of anesthetic and at all other times with physician services available whenever a patient is in the facility; with continuous registered professional nursing services whenever a patient is in the facility; and which does not provide services or other accommodations for patient to stay more than 24 hours. Before discharge from an ambulatory surgical center, each patient shall be evaluated by a physician for proper anesthesia recovery. Nothing in this section shall be construed to require the office of a physician or physicians to be licensed under this act as an ambulatory surgical center." (Emphasis added.)

The corresponding regulation contains the same definition, though organized differently. See K.A.R. 28-34-50(b) (defining an ASC).

In this way, the definition of an ASC expressly requires the employment of physicians to practice medicine—such as performing surgery, administering anesthesia, and monitoring recovery—in order to operate "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f). Furthermore, the implementing regulations require an ASC to hire medical staff to carry out its purpose. See K.S.A. 65-431(a) (the KDHE "shall adopt, amend, promulgate and enforce such rules and regulations and standards with respect to the different types of medical care facilities to be licensed hereunder"). For example, the regulations state that an ASC "shall have an organized medical staff," which may include surgeons, anesthesiologists, and even dentists. K.A.R. 28-34-54(a); see K.A.R. 28-34-54(e) (surgeons); K.A.R. 28-34-56a(b)(1) (anesthesiologists); K.A.R. 28-34-50(p) (dentists). In light of this, it would be

20

"incongruous" to conclude that the Legislature intended an ASC "to accomplish what it is licensed to do without utilizing physicians as independent contractors or employees." *St. Francis*, 254 Kan. at 745. Indeed, it would be absurd. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 918, 296 P.3d 1106 (2013) ("we must construe statutes to avoid unreasonable or absurd results"). Thus, a corporation with an ASC license may, if not must, hire licensed physicians to comply with these rules.

Our decision in *St. Francis* was premised on the fact that the Legislature authorized corporations licensed as hospitals to provide medical services to the public. So too here: the Legislature authorized corporations licensed as ASCs to provide medical services, and it is within the Legislature's power to create such exception to the corporate practice of medicine doctrine. As the Illinois Supreme Court aptly said:

> "[T]he General Assembly has broad regulatory power with respect to the health-care professions, and it is within the discretion of the legislature to not only determine what is required in the public interest and welfare, but also to determine the measures needed to secure such interest. . . . It is within the province of the legislature, in the exercise of its broad regulatory power, to expand the exception to the corporate practice doctrine by expanding the types of corporate entities that are required to submit to licensing requirements and regulatory oversight before they may provide medical services to the public. In this way, a corporation, wishing to employ physicians, may demonstrate its qualifications and accept its responsibilities as a licensed and regulated participant in the medical care system." *Carter-Shields, M.D. v. Alton Health Inst.*, 201 Ill. 2d 441, 462, 777 N.E.2d 948 (2002).

Therefore, we hold the corporate practice of medicine doctrine does not apply to a corporation with an ASC license that operates in compliance with statutory and regulatory mandates.

At this point, we pause to resolve a disagreement between the lower courts and clarify the analytical path forward. In short, the lower courts disagreed about whether CKMC's ASC license applied to the entire facility or just the "ASC," or surgery department. The district court held CKMC's ASC license covered the entire facility, and all of its departments fell under that umbrella. But the Court of Appeals held CKMC's ASC license applied to a subset of medical services, like its pharmacy, home health, and radiation materials licenses. *Hatesohl*, 2016 WL 1079481, at \*8. We adopt the district court's view because it best reflects the medical care facility licensing framework, as summarized below, and clarify that the corporate practice of medicine doctrine requires Dr. Hatesohl's practice to fall within the scope of CKMC's ASC license.

A corporation may apply to the KDHE to obtain a license to operate a medical care facility. K.A.R. 28-34-127(a) (2017 Supp.) ("Any person desiring to operate a facility shall apply for a license on forms provided by the department."); K.A.R. 28-34-126(j) (2017 Supp.) ("'Person' means any individual, firm, partnership, corporation, company, association, or joint-stock association, and the legal successor thereof."); K.S.A. 65-425(c) (same definition of "person"). Again, a "medical care facility" is defined as "a hospital, ambulatory surgical center or recuperation center." K.S.A. 65-425(h). Each type of medical care facility is authorized to provide a distinct scope of medical services. See K.S.A. 65-431(c) ("In formulating rules and regulations, the [licensing] agency shall give due consideration to the size of the medical care facility, the type of service it is intended to render, the scope of such service and the financial resources in and the needs of the community which such facility serves."). For example, a "general hospital" must provide medical services "for not less than 24 hours of every day" in order "to provide diagnosis and treatment for patients who have a variety of medical conditions." K.S.A. 65-425(a). In contrast, an ASC must be "equipped and operated primarily for the purpose of performing surgical procedures" and cannot "provide services or other accommodations for patient to stay more than 24 hours." K.S.A. 65-425(f); K.A.R. 28-34-50(b).

22

To carry out its mission, a medical care facility may provide medical services that require separate licensing. For example, K.A.R. 28-34-59a(a) states: "The ambulatory surgical center shall provide, either directly or through agreement, laboratory, radiology, and pharmacy services to meet the needs of the patients." If an ASC provides these services directly, then it must follow the rules specific to those services, which are separately licensed and regulated. See K.A.R. 28-34-59a(b)(1) (A laboratory "shall hold a valid CLIA certificate for the type and complexity of all tests performed."); 42 C.F.R. § 493.1 et seq. (Clinical Laboratory Improvement Amendments of 1988 [CLIA]); K.A.R. 28-34-59a(d) (Radiology services "shall meet the requirements specified in K.S.A. 48-1607, and amendments thereto."); K.S.A. 48-1607(a) and K.S.A. 48-1603(o) (authorizing the secretary of the KDHE to provide rules for radioactive material licensing); K.A.R. 28-35-175a (2017 Supp.) et seq. (radioactive material licensing rules); K.A.R. 28-34-59a(h) ("The pharmaceutical service . . . shall be provided in accordance with K.A.R. 68-7-11."); K.A.R. 68-7-11 (pharmacy rules).

Taken together, these statutes and regulations establish that a corporation may be licensed to operate a medical care facility, and each type of medical care facility is authorized to provide a distinct scope of medical services. Within that scope, a medical care facility may (or in some circumstances, must) provide medical services that require separate licensing. CKMC's ASC license authorized it to operate "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f); K.A.R. 28-34-50(b). To accomplish this purpose, CKMC was required to provide laboratory, radiology, and pharmacy services (called "ancillary services") to meet the needs of patients. K.A.R. 28-34-59a(a). Thus, the district court correctly held that CKMC's ASC license covered the facility *as a whole*. Because of this, Dr. Hatesohl's practice—like any medical service CKMC offered—had to fall within the scope of its ASC license to satisfy the corporate practice of medicine doctrine.

23

*Dr. Hatesohl's family medicine practice fell outside the scope of CKMC's ASC license, and as a result, his contract with CKMC violated the corporate practice of medicine doctrine.*

If CKMC hired Dr. Hatesohl to perform surgery, this case would end here. The Legislature created an exception to the corporate practice of medicine doctrine for a corporation with an ASC license to hire physicians to practice medicine within the scope of that license: to operate "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f). Of course, performing surgery falls within that scope. But Dr. Hatesohl was hired to practice family medicine, and it is undisputed that he had no privileges to perform surgical procedures at St. Rose. At most, he had consulting privileges to clear patients for surgery, which he never used. Thus, we next consider the plain language of K.S.A. 65-425, as well as the implementing regulations, to determine whether Dr. Hatesohl's practice fell within the scope of an ASC license.

K.S.A. 65-425 does not mention family medicine, so to speak. K.S.A. 65-425(f) defines an ASC as an establishment "with permanent facilities that are equipped and operated primarily for the purpose of performing surgical procedures" that provides continuous physician services during surgical procedures and recovery. The statute also contemplates the administration of anesthesia and limits a patient's stay to 24 hours. Beyond this, the statute is silent about what medical services an ASC may provide while operating "primarily for the purpose of performing surgical procedures." K.S.A. 65-425(f). The parties debate how to construe this language and how the list of "ancillary services" in K.A.R. 28-34-59a(a) informs its meaning.

Dr. Hatesohl and GBRH argue K.S.A. 65-425(f) limits the scope of an ASC license to medical services that are integral to surgery. To illustrate, they contrast a general hospital's broad mandate to "provide diagnosis and treatment for patients who have a variety of medical conditions," with an ASC's narrow mandate to operate

24

"primarily for the purpose of performing surgical procedures." Compare K.S.A. 65-425(a) with K.S.A. 65-425(f). They point out that an ASC is the only medical care facility that, by definition, cannot accommodate a patient more than 24 hours, suggesting it was designed for same-day surgery. See generally K.S.A. 65-425. They also claim the list of "ancillary services" that an ASC must provide is either exclusive or, at the very least, informative about what services are integral to surgery. See K.A.R. 28-34-59a(a). In sum, they argue Dr. Hatesohl's practice did not belong in an ASC because it was not integral to surgery.

CKMC claims K.S.A. 65-425(f) and the related regulations give ASCs wide latitude to offer medical services apart from surgery. CKMC emphasizes that K.S.A. 65-425(f) does not require ASCs to provide surgery *exclusively*. Similarly, CKMC argues the list of "ancillary services" in K.A.R. 28-34-59a(a) is not exclusive but instead sets minimum requirements. CKMC also points out that no statute or regulation prohibits an ASC from providing family medicine services. In essence, CKMC argues an ASC may provide family medicine services because nothing prohibits it from doing so.

The Court of Appeals agreed with CKMC, reasoning:

"Both K.S.A. 65-425(f) and the corresponding administrative regulation, K.A.R. 28-34-50(b), state that an ambulatory surgical center is 'an establishment . . . with permanent facilities that are equipped and operated *primarily* for the purpose of performing surgical procedures.' (Emphasis added.) The statute and regulation do not say 'operated *exclusively* for the purpose of performing surgical procedures,' and GBRH points to no authority for such a limited reading.

"As CKMC points out, it was also licensed to provide services other than surgical procedures; it held licenses for its pharmacy, home health agency, and radiation materials. No party points to any statute or regulation that requires a specific license for a medical care facility to offer family medicine services. In addition, K.A.R. 28-34-59a(a) actually requires ambulatory surgical centers to 'provide, either directly or through

25

agreement, laboratory, radiology, and pharmacy services to meet the needs of the patients.' The fact that the legislature expressly allows an ambulatory surgical center to directly provide services other than surgical procedures flies in the face of [the] notion that Kansas policy limits an ambulatory service center to only provide surgical services." 2016 WL 1079481, at *9.

In the end, the panel suggested that an ASC could provide a broad scope of medical services, stating: "Like a hospital, an ambulatory surgical center may—and in some cases must—provide services other than those directly involving surgery, especially when the facility is also licensed to provide other medical services including a pharmacy, home health services, and radiation services." 2016 WL 1079481, at *15.

We agree with CKMC and the panel that the scope of an ASC license is not limited exclusively to surgical procedures. But we disagree that the scope is expansive enough to cover Dr. Hatesohl's family medicine practice, which bore no relation to St. Rose's surgical procedures.

The plain language of K.S.A. 65-425(f) requires an ASC to operate "primarily for the purpose of performing surgical procedures." Clearly, a medical service that is necessary to perform surgery safely falls within this scope. For example, the list of "ancillary services" falls into this category. See K.A.R. 28-34-59a(a) ("The ambulatory surgical center shall provide . . . laboratory, radiology, and pharmacy services *to meet the needs of the patients*." [Emphasis added.]). Indeed, common experience tells us that a person undergoing a surgical procedure may need to have an x-ray done, blood taken, or medicine prescribed. But importantly, the list of "ancillary services" is not exclusive. K.A.R. 28-34-59a(a) contains no language that limits an ASC to providing only the medical services listed or prohibits it from providing additional ones. And elsewhere, the ASC regulations mention other medical services that may be necessary for surgery, such as dentistry or anesthesiology. See K.A.R. 28-34-54(l) (dentistry); K.A.R. 28-34-56a(b)(1) (anesthesiology). Thus, the regulations establish the minimum set of services

26

that an ASC must offer while permitting it to provide additional medical services to meet the needs of patients.

At the other end of the spectrum, a medical service that bears no relation to surgical procedures falls outside the scope of an ASC license. K.S.A. 65-425 authorizes a general hospital to treat a variety of medical conditions but limits an ASC to operating primarily for surgery. To permit an ASC to provide medical services that are unrelated to its surgical purpose would erase the distinction the Legislature made between the medical care facilities and would defy K.S.A. 65-425's plain language. That said, we will not determine the fate of medical services that lie between these two extremes today because the facts do not present the opportunity to do so. Based on the facts specific to this case, we hold Dr. Hatesohl's family medicine practice fell outside the scope of CKMC's ASC license because it bore no relation to the surgical procedures at St. Rose.

The relevant facts are undisputed. CKMC contracted with Dr. Hatesohl only to practice family medicine, which is a specialty that cares for the family from birth to death and serves as a gatekeeper to the medical system. Though Dr. Hatesohl could perform minor surgical procedures as part of this specialty, CKMC denied his application for privileges to do so. Furthermore, the relationship between Dr. Hatesohl's practice and the surgery department at St. Rose was tenuous at best. As part of his practice, Dr. Hatesohl provided preoperation evaluations for his patients, no matter where they planned to have surgery—it was not specific to St. Rose. Though Dr. Hatesohl had privileges at St. Rose to clear patients for surgery who had no primary care doctor, he never used them. This suggests that such consultations were not part of Dr. Hatesohl's regular practice. To summarize, Dr. Hatesohl never had surgical privileges with St. Rose; he supplied no medical services to the surgery department; and CKMC hired him to provide primary care, nothing more.

27

In conclusion, the evidence shows that Dr. Hatesohl's family medicine practice bore no relation to the surgical procedures at St. Rose. Because of this, Dr. Hatesohl's practice fell outside the scope of CKMC's ASC license. Put differently, CKMC hired Dr. Hatesohl to practice medicine that the corporation was not licensed to perform. This means the contract between Dr. Hatesohl and CKMC violated the corporate practice of medicine doctrine.

"[I]t is well settled both in law and in equity that the courts will not aid either party to an illegal agreement." *Early Detection Center*, 248 Kan. at 879; see *Petty v. City of El Dorado*, 270 Kan. 847, 854, 19 P.3d 167 (2001) ("The public policy of a state is the law of that state as found in its constitution, its statutory enactments, and its judicial decisions. . . . Contracts in contravention of public policy are void and unenforceable."); *Wycoff v. Quick Way Homes, Inc.*, 201 Kan. 442, 447, 441 P.2d 886 (1968) ("Illegal contracts are generally unenforceable."). Because the contract between Dr. Hatesohl and CKMC is unenforceable, we reverse the Court of Appeals and affirm the district court's grant of summary judgment for the defendants.

Reversed.

\* \* \*

STEGALL, J., concurring:  The corporate practice of medicine doctrine is a judicial innovation. The doctrine "was based on a judicial interpretation, which had not been expressly overturned by legislation, rather than on any statutory provision(s)." *St. Francis Regional Med. Center, Inc. v. Weiss*, 254 Kan. 728, 736, 869 P.2d 606 (1994). This "judicial interpretation" arose from the belief that "to permit a corporation to practice a licensed profession would be injurious to the public welfare" and from a desire to "protect the public health." 254 Kan. at 745-46.

28

Infirm from the start, the doctrine amounts to an injection of judicial lawmaking into a realm of public policy traditionally reserved to the Legislature. See *In re Gunn, Petitioner*, 50 Kan. 155, 223, 32 P. 948 (1893) (Allen, J., dissenting) ("Generally speaking, the courts have nothing to do with matters of policy, or with the determination of questions as to the expression of the popular will."). More perniciously, the doctrine is a species of rent-seeking, coopting this court and its power to make common law in favor of a private interest group (in this case organized medical professionals) in order to provide shelter from economic competition—all under the guise of public safety and welfare. See *District Intown Properties v. District of Columbia*, 198 F.3d 874, 885 (D.C. Cir. 1999) (Williams, J., concurring) ("While the resulting proposals are naturally advanced in the name of the public good, many are surely driven by interest-group purposes, commonly known as 'rent-seeking.'"). Finally, economic and legal changes in the century since the adoption of the doctrine have both highlighted its inefficiencies and undermined its effectiveness. For these reasons, in the appropriate case, we ought to reconsider and discard the doctrine altogether.

BACKGROUND

In *Winslow v. Board of Dental Examiners*, 115 Kan. 450, 223 P. 308 (1924), we first held a corporation could not practice dentistry through the employment of a licensed dentist because:  "Corporations may not be graduated from dental colleges, they have neither learning nor skill, and they may not be examined, registered, nor licensed as dentists. Therefore the legislature does not permit the organization of a domestic corporation to practice dentistry." 115 Kan. at 452. In so holding, we said a "personal"—as opposed to corporate—practice of dentistry was necessary "to protect the public from ignorance, unskillfulness, unscrupulousness, deception, and fraud." 115 Kan. at 451-52. We even declared the corporate practice of dentistry was "gravely reprehensible from the standpoint of morality." 115 Kan. at 452. Thus, without any textual command, we "inferred a legislative intent to establish a corporate practice of medicine ban based upon

29

these public policy grounds." Comment, *The Abandonment of the Antiquated Corporate Practice of Medicine Doctrine:  Injecting a Dose of Efficiency into the Modern Health Care Environment*, 47 Emory L.J. 697, 706 (1998).

Arguably the judicial inference of legislative intent drawn by the *Winslow* court arose as a judicial gloss on a statutory scheme that did not give medical licenses to corporations. A cursory examination, however, demonstrates that the rule cannot be justified as any species of statutory interpretation. Indeed, in what sense would a corporation employing a dentist be practicing dentistry? The dentist is the license holder and the practitioner. The manner in which the dentist chooses to organize his or her business affairs is entirely untouched by the licensure scheme. Much later, in *St. Francis*, we obliquely acknowledged the common law grounding of our corporate practice of medicine doctrine when we noted that the rule was not "based . . . on any statutory provision." 254 Kan. at 736. Instead, this common law rule was anchored half-heartedly in the statutory scheme with a dubious logical leap that "equated a corporation's employing a licensed professional individual who practiced dentistry or optometry with a corporation's practicing that profession." 254 Kan. at 735.

Other courts adopting a judicial ban on the corporate practice of medicine followed a similar analytical path. As the Minnesota Supreme Court summarized:

> "When adopted by state courts, the general prohibition on corporate employment of licensed health care professionals has been based on a corporation's inability to satisfy the training and licensure requirements set out in state statutes and related public policy considerations. . . . The related public policy considerations underlying the prohibition on corporate practice of a profession include concerns raised by the specter of lay control over professional judgment, commercial exploitation of health care practice, and the possibility that a health care practitioner's loyalty to a patient and an employer will be in conflict." See *Isles Wellness, Inc. v. Progressive Northern Ins. Co.*, 703 N.W.2d 513, 517 (Minn. 2005).

Thus, the ban against the corporate practice of medicine took root in fear—fear that the quality of medical care would suffer from divided loyalty, lay control, and commercial exploitation. See *People v. Cole*, 38 Cal. 4th 964, 971, 135 P.3d 669, 44 Cal. Rptr. 3d 261 (2006) ("Courts have said that the ban on the corporate practice of medicine 'is intended to ameliorate "the evils of divided loyalty and impaired confidence" which are thought to be created when a corporation solicits medical business from the general public and turns it over to a special group of doctors, who are thus under lay control.'"); *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 10, 688 N.E.2d 106 (1997) ("The prohibition on the corporate employment of physicians is invariably supported by several public policy arguments which espouse the dangers of lay control over professional judgment, the division of the physician's loyalty between his patient and his profitmaking employer, and the commercialization of the profession."); see also Huberfeld, *Be Not Afraid of Change:  Time to Eliminate the Corporate Practice of Medicine Doctrine*, 14 Health Matrix 243, 251-52 (2004) (citing three "major concerns" that "played a part in creating and extending the corporate practice of medicine doctrine": divided loyalty, lay control over medical decision-making, and commercial exploitation of physicians).

This fear was sowed long ago by a special interest group, the American Medical Association (AMA). That the AMA formulated and promoted the doctrine as a form of economic protectionism is well-documented. See generally Gustavson & Taylor, *At Death's Door—Idaho's Corporate Practice of Medicine Doctrine*, 47 Idaho L. Rev. 479 (2011); Huberfeld, 14 Health Matrix 243; Freiman, 47 Emory L.J. 697; Chase-Lubitz, *The Corporate Practice of Medicine Doctrine:  An Anachronism in the Modern Health Care Industry*, 40 Vand. L. Rev. 445 (1987). The AMA was created in the mid-1800s to legitimize the medical profession by imposing higher standards and weeding out the "quackery" of lay doctors. 40 Vand. L. Rev. at 449; 14 Health Matrix at 245-46. At first, the AMA worked to establish an ethical code, enact medical licensing statutes, and

reform medical education. 40 Vand. L. Rev. at 450-55; 47 Idaho L. Rev. at 484-88. But soon the AMA became the medical profession's "central source of power and policy-making." 40 Vand. L. Rev. at 454.

In the early 1900s, "the AMA targeted a new economic threat to its member physicians and their control of the medical profession—the ever-increasing rate of corporate involvement in the practice of medicine." 47 Idaho L. Rev. at 488-89; see 40 Vand. L. Rev. at 455. As one scholar summarized, the corporate threat generally took two forms:

"In the first form, popularly known as contract practice, corporations employed physicians to serve the medical needs of employees. In the isolated industries of railroad, mining, and lumbering, doctors contracted to treat employees for a predetermined salary. Corporations in smaller and more urban industries contracted with independent physicians to provide medical care to the corporations' employees for a set rate per worker per month. Under both schemes the corporation dictated the choice of physicians.

"In the second form, known as corporate practice, for-profit medical service companies marketed physicians' services to the public. Corporate practice developed in its largest scale in Oregon and Washington in the early 1900s. Corporations in these states contracted with mining and lumber companies to provide medical services to company employees for a fixed rate per worker. The corporations first employed their own doctors to perform these services, but later subcontracted the work to independent doctors. Although physicians founded these corporations, eventually they were managed by lay people. Corporate management maintained limited control over the doctors with whom they contracted. Management required second opinions before surgery, reviewed the length of hospital stays, and refused to pay fees deemed excessive.

"Contract and corporate practice raised myriad concerns among the medical establishment. Contract or corporate practice, critics argued, would force doctors to maintain a high patient load and, thus, the quality of services delivered would deteriorate. Furthermore, fixed salaries and fees repudiated the traditional fee-for-service mechanism

32

that allowed physicians to value their own services and, as a result, control their own income levels. Fixed salaries and fees paid for indefinite volumes of work, however, would result in low earnings and potential out-of-pocket expenses for physicians.

"Opponents of contract and corporate practice also complained that these schemes forced doctors to bid against each other for contracts, thus driving their reimbursements down to unconscionable levels. The schemes also threatened the profession's monopolistic designs by creating stiff competition with individual physicians and by permitting lay persons to make policy decisions concerning which patients a doctor could see and the amount of services a doctor could provide." 40 Vand. L. Rev. at 456-58.

See 47 Idaho L. Rev. at 489-90; 14 Health Matrix at 247-48.

In response, the AMA introduced the corporate practice of medicine doctrine. It did so "in an effort for doctors to gain better control over the medical profession and to prevent the commercialization of the profession through the introduction of profit-making incentives." 47 Emory L.J. at 697-98; see 40 Vand. L. Rev. at 455 (describing the corporate practice of medicine as a threat to physician autonomy and an unwanted source of competition). The AMA argued the corporate practice of medicine would cause physician loss of control and "would (i) divide physician loyalty between corporate employers and patients, (ii) introduce nonprofessional control over medical decision-making, (iii) and sacrifice quality medical care for the sake of for-profit considerations." 47 Idaho L. Rev. at 490-91. The AMA also wove the doctrine into its ethical code. 47 Emory L.J. at 701-03; 47 Idaho L. Rev. at 491-93. For example, one amendment to the code stated that any contract permitting a lay entity to profit directly from the provision of medical services is "'beneath the dignity of professional practice, is unfair competition with the profession at large, is harmful alike to the profession of medicine and the welfare of the people, and is against sound public policy.'" 47 Emory L.J. at 703 (quoting Laufer,

33

*Ethical and Legal Restrictions on Contract and Corporate Practice of Medicine*, 6 Law & Contemp. Probs. 516, 519 [1939]).

State courts, "heavily influenced by the AMA's articulation of the public policy concerns with the corporate practice of medicine, soon established corporate practice of medicine doctrines by expansively interpreting state medical practice acts as prohibiting the corporate practice of medicine." 47 Idaho L. Rev. at 493; see 14 Health Matrix at 252 (courts embraced the AMA's arguments against the corporate practice of medicine in the early 1900s). In sum, "the existence of the corporate practice of medicine doctrine is dependent upon sometimes strained interpretations of statutory language in light of the various public policy grounds which led the AMA to pursue the doctrine more than eighty years ago." 47 Emory L.J. at 732-33.

ANALYSIS

In light of this history, it is worth asking—does the public interest truly justify a judicial ban against the corporate practice of medicine? And was it our job to enter this policy debate (and side with one interest group) in the first place? Finally, what are the constitutional restraints—if any—on laws that exhibit naked rent-seeking? I will explore each question briefly in turn.

As today's case illustrates, when exceptions begin to swallow the rule, the original policy explanations for the rule become suspect. Courts across the country have chipped away at the doctrine by recognizing exceptions for professional corporations, hospitals, and the like:

> "By 1971, all states had enacted statutes allowing physicians to practice through
> professional corporations, although such laws generally restrict share ownership to
> licensed professionals. Courts in jurisdictions with corporate practice bars have long

taken judicial notice of the fact that hospitals and their affiliates employ physicians, and enforcement of restrictive doctrines in some of these jurisdictions is notoriously lax. In some jurisdictions, courts have gone out of their way to infer exceptions for specific practices, such as employment of physicians by teaching hospitals, private hospitals, federal military hospitals, and employers engaging 'company doctors' for employees." Fichter, *Owning A Piece of the Doc: State Law Restraints on Lay Ownership of Healthcare Enterprises*, 39 J. Health L. 1, 6-7 (2006).

Kansas also jumped on the bandwagon. First we recognized exceptions for professional corporations and licensed hospitals, and now we recognize one for licensed ASCs. In *St. Francis*, we held the corporate practice of medicine by licensed hospitals is "not contrary to the interest of public health, safety, and welfare." 254 Kan. at 746. Today we hold the same for licensed ASCs (and, by extension, for all licensed medical care facilities). And for good reason—it appears the Legislature authorized corporations to practice medicine in these ways to *promote the public welfare*.

I also question the viability of the corporate practice of medicine doctrine given the dramatic changes that have swept the healthcare industry since its inception. Put simply, with the rising costs of healthcare, the solo practitioner making house calls has become obsolete and the shift to integrated medicine is well underway. See 47 Emory L.J. at 738 ("The trend towards integration encompasses both the high level of merger activity among hospitals and the movement of physicians away from solo practices and toward group practices."); 14 Health Matrix at 257 ("Solo practitioners and small group practices increasingly are falling by the wayside as larger group practices and affiliations with hospitals become the norm, if for no other reason than the need for cost savings."). Furthermore, the modern healthcare market is dominated by corporate managed care organizations (MCO) and their "cost-minimizing" approach. 47 Emory L.J. at 740; see Harris & Foran, *The Ethics of Middle-Class Access to Legal Services and What We Can Learn from the Medical Profession's Shift to a Corporate Paradigm*, 70 Fordham L. Rev. 775, 813 (2001) (explaining how "the old system of fee-for-service reimbursement and

physician control over the delivery of medical services began to crumble" because of rising healthcare costs, paving the way for the rise of MCOs). Given this, the corporate practice of medicine doctrine seems impractical at best.

But even more troubling, the doctrine may deny access to medical services for rural and low-income populations. As one scholar explains, "[p]hysicians especially have a disincentive to practice in rural or remote areas, which inherently pose significant economic risks due to their size and disadvantaged status," and therefore, "[a] prohibition on the corporate practice of medicine limits the more efficient and economical forms in which a physician can practice . . . effectively endangering rural access to health care." 47 Idaho L. Rev. at 518. As another scholar argues, "there is ample evidence that the doctrine raises prices and decreases access to legal and medical services, and there is no countervailing evidence that it increases the quality of services rendered." Robertson, *Private Ordering in the Market for Professional Services*, 94 B.U. L. Rev. 179, 225 (2014).

Finally, and perhaps most telling, the AMA was forced to lift its ethical ban against the corporate practice of medicine. *Isles Wellness*, 703 N.W.2d at 528 (Hanson, J., concurring in part, dissenting in part); 47 Emory L.J. at 710-11. In 1979, the Federal Trade Commission (FTC) determined the AMA engaged in unfair methods of competition by "keeping physicians from adopting what may be more economically efficient business formats" through its ethical bans on the corporate practice of medicine. *Matter of the Am. Med. Assoc.*, 94 F.T.C. 701, 1979 WL 199033, at *241 (1979); see 14 Health Matrix at 255-56. Ultimately, the FTC ordered the AMA to cease and desist from restricting such business formats. 1979 WL 199033, at *251. Thus, the ethical impetus for the doctrine no longer exists.

Because I suspect the doctrine has, at least, "been rendered meaningless and unnecessary by the fundamental changes that have occurred in the practice of medicine

over recent decades," *Isles Wellness*, 703 N.W.2d at 525 (Hanson, J., concurring in part, dissenting in part), and has, at worst, created an aggregate public *harm*, I suggest on policy grounds alone the time has come for this court to abolish it. I echo the concern that

> "[g]iven the changes which have occurred in the health care industry and the exceptions which states have carved out of their corporate practice bans, the public policy grounds which gave rise to the doctrine provide less of an imperative for the continued existence of the bans. Furthermore, the need for continued movement towards efficiency in the health care industry and the barrier that the doctrine places in front of progression towards efficiency make its continued existence imprudent." 47 Emory L.J. at 698.

But more importantly, the doctrine should be abolished because we had no business jumping into this policy debate in the first place. See *Higgins v. Abilene Machine, Inc.*, 288 Kan. 359, 364, 204 P.3d 1156 (2009) ("[W]e are not free to act on . . . our view of wise public policy. We leave the guidance of public policy through statutes to the legislature."). Now, with the changing tides of healthcare delivery, it is time to send this debate back to the Legislature where it belongs. As Justice Edmonds presciently said when his colleagues on the California Supreme Court adopted the corporate practice of medicine doctrine:

> "In recent years the subjects of health insurance and group medicine have been the frequent source of discussion and investigation, and both lay and professional opinion concerning them is sharply divided. The need for some such service, particularly for persons of low income, is conceded by all parties to the controversy. The courts, in the absence of legislation, should not on the ground of public policy place a stumbling-block in the way of working out this problem. It is not a proper function of the courts to thus block the natural growth of social and economic processes.
>
> . . . .

"It is claimed that the medical profession will be commercially exploited if private corporations interested solely in a profit are permitted to engage in activities such as are here involved. If that is an evil the solution rests with the legislature and not with the courts." *People ex rel. State Bd. of Medical Examiners v. Pacific Health Corp.*, 12 Cal. 2d 156, 164-65, 82 P.2d 429 (1938) (Edmonds, J., dissenting).

So too here. In the absence of legislation banning the corporate practice of medicine, I would not tether the doctrine to "the perilous sands of shifting public policy." *Apodaca v. Willmore*, 306 Kan. 103, 137, 392 P.3d 529 (2017) (Stegall, J., dissenting). Or, as Justice Hanson on the Minnesota Supreme Court put it: "I would decline to impose prohibitions where none has been imposed by the legislature." *Isles Wellness*, 703 N.W.2d at 526 (Hanson, J., concurring in part, dissenting in part).

As a final matter, I question whether a blanket ban on the corporate practice of medicine is constitutional under either our federal or state constitution. For one thing, "[c]ourts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002); see, e.g., *Patel v. Texas Department of Licensing and Regulation*, 469 S.W.3d 69, 122 (2015) (Willett, J., concurring) (rejecting "[n]aked economic protectionism" as a constitutional government end). Here, the corporate practice of medicine doctrine was created at the behest of the AMA to protect its members from economic competition—arguably harming the public in the process. The doctrine might fail even the watered-down rational basis review typically applied when evaluating economic regulations under the United States Constitution. See, e.g., *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) (holding a licensing regulation that discriminated between pest-controllers based upon the type of pest controlled failed "the relatively easy standard of rational basis review" because it "was designed to favor economically certain constituents at the expense of others similarly situated").

If, for example, the following was established, rational basis may not be satisfied:

"'[E]vidence of an intent to benefit one group of people at the expense of others, i.e., protectionism; evidence refuting the law's ostensible public-interest rationale; the presence of less restrictive alternatives to satisfy the law's ostensible purpose; evidence showing a harm to competition and consumers; and, perhaps, evidence that the law may interfere with interstate commerce.'" 94 B.U. L. Rev. at 224 (quoting Agarwal, *Protectionism as a Rational Basis? The Impact on E-Commerce in the Funeral Industry*, 3 J.L. Econ. & Policy 189, 213 [2007]).

Thus, courts inspecting economic regulations for constitutionality "need not be oblivious to the iron political and economic truth that the regulatory environment is littered with rent-seeking by special-interest factions who crave the exclusive, state-protected right to pursue their careers." *Patel*, 469 S.W.3d at 118 (Willett, J., concurring).

In the end, I acknowledge the present court inherited this unfortunate doctrine and has applied it on the basis of stare decisis. Furthermore, because no party asks us to overturn the doctrine today, I am compelled to concur with the majority. But I propose that "though no party in this case has asked us to reconsider these precedents, at some point, it behooves us to do so." *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. __, 138 S. Ct. 1461, 1487, 200 L. Ed. 2d 854 (2018) (Thomas, J., concurring). And at that point, I would discard the doctrine.